**STATE**

v.

**Joseph MEDEIROS.**

No. 2009–207–C.A.

Supreme Court of Rhode Island.

June 8, 2010.

Virginia M. McGinn, Department of Attorney General, for Plaintiff.

Janice M. Weisfeld, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Joseph Medeiros (Medeiros or defendant) appeals from a judgment of conviction on two counts of second-degree child molestation, one count of first-degree sexual assault, and one count of second-degree sexual assault. On appeal, he argues that the trial justice erred when she permitted the state to present the witness statement of a prior molestation victim of the defendant under Rule 404(b) of the Rhode Island Rules of Evidence. Additionally, the defendant argues that the trial justice abused her discretion when she adjudicated him guilty and when she denied his motion for a new trial. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

Until July 2004, Medeiros lived in Tiverton with his girlfriend and their two young sons. His girlfriend's daughter from a previous relationship, Jennifer Richards,[1] also lived in the couple's home until she moved to Westport, Massachusetts, in 2002 at the age of thirteen to live with her father. Medeiros's relationship with Jennifer's mother had begun when Jennifer was three or four years old. When the couple moved to Tiverton in 1998, Jennifer was nine years old. According to Jennifer, at that time she and Medeiros had a "normal relationship" similar to that usually found between a stepfather and stepdaughter.

However, Jennifer recalled that their relationship soon changed. She said that Medeiros began making inappropriate comments to her about her appearance. According to Jennifer, he later began to touch her inappropriately. She said that when she was still nine years old, Medeiros stood behind her to help her open the door to their home's garage and he touched her vagina, buttocks, and chest over her clothes. She did not tell anyone about this incident after it happened because she "didn't really understand what was going on at that point" and "was just really confused and not sure what to do about it."

According to Jennifer, Medeiros inappropriately touched her again a couple of months after the first incident. This time, she and her youngest brother, then a toddler, were in the garage preparing to ride a dirt bike together. As she put her helmet on and assisted her brother with his, Medeiros sat on the dirt bike behind her and touched her between her legs over her clothing with both hands. Jennifer managed to get her brother on the bike, and she rode away. Jennifer said that as she did so Medeiros pushed her head forward, told her "to shut up," and called her a "bitch."

Jennifer said that another incident involving her and Medeiros occurred when she was fourteen, after she had moved out of the Tiverton home to live with her father. She was visiting her family in Tiverton during her summer vacation and spent the evening in her bedroom alone before socializing with friends. Her mother was not home, and her younger brothers were elsewhere in the house playing. As she sat on her bed, Medeiros angrily came into her room. Jennifer said that she thought that he was aggravated because she had not completed some chore. According to Jennifer, he "pulled [her] to the edge of the bed and pulled [her] pants off." She said that he then "took [her] round [hair] brush and proceeded to shove it inside of

1. We have used a pseudonym to protect the identity of the complaining witness.

[her]." He did this "a couple of times" while she attempted "to push him off" and "tell[ ] him to stop." Jennifer said that Medeiros then called her a "bitch" and told her "to shut up." She recalled that she didn't tell anyone about the incident because she "was scared." According to Jennifer, Medeiros told her that her brothers would be taken away and her mother wouldn't love her anymore if she told anyone what had happened.

Jennifer said that the next incident occurred when she was fifteen years old. She awoke in her bed to find that her pajama bottoms had been removed and that Medeiros was attempting to have sexual intercourse with her.[2] Jennifer said that she pushed him off her, and he told her "to shut up" again. She said that this was the last such incident that occurred between her and Medeiros.

Approximately a month and a half later, Jennifer learned that Medeiros also had been accused of sexually assaulting her best friend, Tanya.[3] He was arrested in early July 2004. Thereafter, the Department of Children, Youth and Families (DCYF) questioned Jennifer as part of an investigation that was precipitated by Medeiros's arrest. However, she acknowledged that she maintained to investigators that Medeiros had never touched her inappropriately. Jennifer said that she didn't tell DCYF about the incidents because she "was scared" and feared that her brothers would be taken away if she came forward. Ultimately, Medeiros entered a plea of nolo contendere on two counts of third-degree sexual assault against Tanya. Jennifer wrote a favorable letter about Medeiros entitled "Why We Need Joe" for his sentencing hearing in that case. She said that she wrote the letter because she "was still scared" and because her mother and brothers "were going through so much that [she] didn't want to make it worse."[4]

Eventually, Jennifer told her friends that she had been "sexually abused" and that she "didn't know what to do about it." She reported her allegations to the Tiverton Police Department on August 27, 2004.[5] On November 17, 2006, a grand jury returned an indictment charging Medeiros with one count of first-degree sexual assault, two counts of second-degree

---

**2.** Jennifer also said that at the time of this incident she had been taking sleeping medication for about a year.

**3.** Tanya, also a pseudonym, described Medeiros as a "good family friend" who worked with her father. She had known him for her entire life. According to Tanya, when she was approximately eleven years old her relationship with Medeiros changed; he started to kiss her and touch her inappropriately. Eventually, when she was not yet twelve years old, she said that they began to have sexual intercourse. This behavior persisted for about a year, but Tanya did not tell Jennifer about what was happening between her and defendant because she was "scared" and "didn't want to hurt [Jennifer's] family." According to Jennifer, she and a friend began to suspect that Medeiros and Tanya were spending time together in the woods and reported the suspicions to her friend's mother who, in turn, informed Tanya's mother. In July 2004, Tanya reported the incidents between her and defendant to the police. Tanya said that she has not spoken with Jennifer since her allegations against defendant came to light.

**4.** Medeiros received a five-year sentence with two years to serve and the remaining three suspended.

**5.** According to Jennifer, the two-year delay between the time that she gave the witness statement in August 2004 and her testimony before a grand jury in 2006 was due to her hospitalizations for mental illness during that time. She said that she attempted suicide "at least three times" and "was on and off medications." Jennifer indicated that the goal of her counseling during those two years was to be able to talk in front of others about what she alleged had occurred between herself and Medeiros.

child molestation, and one count of assault with intent to commit first-degree sexual assault.

Before trial, the state moved for the admission of the 1990 witness statement of another victim of defendant. That statement had served as the basis for a charge of second-degree child molestation against Medeiros in 1991, to which he had pleaded nolo contendere.[6] In her statement, dated June 14, 1990, the victim, who was the then eight-year-old female cousin of defendant, said that three days earlier she had been watching television on the couch in her mother's living room with defendant when he "started to touch [her] on [her] private parts" over her clothes. She also said in the statement that Medeiros had touched her inappropriately in the past and "told [her] not to tell [her] mother or father." The statement also contained a description of an incident that had occurred two weeks earlier when defendant exposed himself to her by pulling down his pants while she was watching television. The victim also indicated in the statement that defendant then pulled his pants up and sat next to her on the couch while he touched her vaginal area over her clothes. At the time of this incident, Medeiros lived in another apartment in the same building in which the victim resided and he would babysit the victim occasionally.

The state offered the witness statement "to show that Mr. Medeiros's sexual behavior towards [Jennifer Richards] was part of a common scheme or plan of sexual misconduct that Mr. Medeiros carried out against children of a similar age, and at a time when they * * * were under Mr. Medeiros's control to a certain extent."

The record indicates that there was "extensive discussion regarding the evidentiary relevance of this statement in chambers" as well as defendant's objection to the admission of the statement. Nonetheless, the trial justice ruled that the statement was admissible.

The defendant waived his right to a jury trial, and a trial was held before a justice of the Superior Court on December 9, 10, 11, 12, and 16, 2008. Jennifer, the Tiverton police officers who received Jennifer's complaint in 2004, Tanya, Tanya's mother, and defendant's mother testified at trial. Medeiros was convicted on all counts. On March 4, 2009, the trial justice heard and denied defendant's motion for a new trial. On that day he was sentenced to a term of fifty years, with thirty years to serve and twenty years suspended, with twenty years of probation for first-degree sexual assault, two concurrent terms of fifteen years, with ten years to serve and five years suspended, with a period of five years probation for two counts of second-degree child molestation, and a concurrent term of twenty-five years, with fifteen years to serve and ten years suspended, with ten years of probation for second-degree sexual assault. Medeiros timely appealed to this Court.

## II

### Issues on Appeal

Medeiros raises two arguments on appeal. First, he argues that the trial justice abused her discretion when she admitted into evidence the witness statement of a prior molestation victim of defendant under Rule 404(b).[7] Second, defendant con-

---

6. Medeiros received a nine-year suspended sentence and nine years of probation.

7. Rule 404(b) of the Rhode Island Rules of Evidence provides in relevant part:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes,

tends that the trial justice abused her discretion when she found him guilty of the charges and when she denied his motion for a new trial "because the evidence called for a verdict of not guilty" and also because she "overlooked and misconceived the material evidence and was otherwise clearly wrong."

## III

### Analysis

#### A

#### Admissibility of Witness Statement

■ As an initial matter, we are troubled by the absence from the record of the trial justice's reasoning underlying her ruling on the admissibility of the witness statement. The discussions between the trial justice and the parties about the admissibility of this evidence occurred in chambers without the presence of a stenographer and, therefore, were not on the record. The defendant faults the trial justice for failure "to place on the record the reasons behind her ruling on admissibility." However, it is the responsibility of the party claiming the error to provide a complete record so that this Court may weigh the merits. *See Shorrock v. Scott,* 944 A.2d 861, 864 (R.I.2008) ("It was [the] defendant's responsibility to provide those portions of the trial transcript that are necessary for this Court to perform a meaningful review."); *State v. Pineda,* 712 A.2d 858, 861 (R.I.1998) (declining "to overlook the glaring defects in [the] record" furnished by the petitioner). In our opinion, defendant had a responsibility to request that the trial justice place the rationale for her reasoning on the record. He does not contend that she refused to do so. Therefore, "[i]n the absence of the

such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, ab-

transcript or other adequate record of the proceedings in the court below, we are unable to consider the issues raised by [the] defendant's appeal." *State v. Jennings,* 117 R.I. 291, 294, 366 A.2d 543, 545 (1976).

Although it is our opinion that this issue has not been properly preserved, we recognize that the state has conceded in its brief that the record is sufficient to demonstrate that the witness statement was properly admitted. Therefore, we shall address the issue briefly. Based upon the record before us, we conclude that defendant's argument lacks merit.

The essential facts of Medeiros's previous sexual misconduct with his cousin, as set forth in her witness statement are not in dispute; they also bear many similarities to Jennifer's testimony, which the trial justice found to be credible. The incident involving Medeiros's cousin occurred in 1990 when she was eight years old. The first incident with Jennifer occurred when she was nine years old. In both cases, Medeiros was an older adult relative who lived in the same household with each girl at the time of the sexual misconduct. In addition, the nature of the offensive touchings began in a strikingly similar fashion. In her witness statement, Medeiros's cousin said he touched her private parts over her clothes, whereas Jennifer testified that Medeiros first touched her vagina, buttocks, and chest over her clothes. In light of the evidence that is in the record, we cannot say that the trial justice abused her discretion in admitting the 1990 witness statement of Medeiros's cousin. We conclude, rather, that the prior incident was similar to the charged offense, nonremote, and tended to show a common scheme or

sence of mistake or accident * * *."

plan to sexually assault young girls in his family.

Moreover, given that this evidence was admitted in the context of a jury-waived trial, any risk of unfair prejudice was substantially diminished. *See State v. Edwards*, 810 A.2d 226, 242 (R.I.2002) (noting that in nonjury trials, "the risk of undue prejudice under [R.I. R. Evid.] Rule 403 * * * [is] minimal"). Because this was a jury-waived trial, and because of the deference we afford to the trial justice's evidentiary rulings, we cannot say that the probative value of this relevant evidence was "substantially outweighed by the danger of unfair prejudice." Rule 403. Therefore, even if this issue was properly before this Court, we would not be able to say that the trial justice abused her discretion when she ruled that the witness statement was admissible evidence.

## B

### Adjudication of Defendant as Guilty and Denial of the Motion for a New Trial

Before she found defendant guilty of all charges, the trial justice made a number of factual findings. She described the incidents that Jennifer testified about and how Jennifer eventually came forward with the allegations against defendant. She found it "clear beyond any doubt" that Jennifer's testimony was "believable" and "completely truthful." Accordingly, the trial justice found that "the defendant has been proven guilty based on [Jennifer's] testimony and all of the other evidence beyond a reasonable doubt."

During the hearing on the motion for a new trial, defense counsel urged that the trial justice erred when she found defendant guilty because "it appeared that [the trial justice] really did not digest or pay attention to any defense witnesses or any defense exhibits" and rather based her decision on Jennifer's testimony, which she found to be credible. He also argued that the trial justice improperly considered documents that were not in evidence. When she ruled on defendant's motion for a new trial, the trial justice incorporated her findings "concerning the adjudication of guilt and the assessment of credibility of witnesses." She acknowledged that the documents that defendant objected to were not included as evidence and conceded that she had reviewed them, but she explained that she did not rely on the documents "in any fashion." Additionally, the trial justice discussed the testimony of defendant's mother and concluded that her testimony did not impact the trial justice's assessment of Jennifer's credibility. Finally, she assured defendant's counsel that she had indeed read the DCYF records and Jennifer's hand-written letters in which she claimed that defendant had never harmed her "in the context of the trial, and in no way do they undermine this Court's eventual and final assessment of [Jennifer's] testimony, which I stand by." She then denied defendant's motion for a new trial and proceeded to sentence him.

### 1

### Standard of Review

■■■ "In a jury-waived criminal proceeding, this Court gives deference to a trial justice's finding[s] of facts." *State v. Adewumi*, 966 A.2d 1217, 1221–22 (R.I. 2009) (quoting *State v. Forand*, 958 A.2d 134, 138 (R.I.2008)). When we review these "determinations of credibility and findings of fact by a trial justice sitting without a jury, this Court will not disturb the trial justice's findings unless they are clearly wrong or the trial justice misconceived or overlooked material evidence on a controlling issue." *Id.* (quoting *State v. LaCroix*, 911 A.2d 674, 679 (R.I.2006)).

"It is well-established that we 'accord a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record.' " *State v. Erminelli,* 991 A.2d 1064, 1069 (R.I.2010) (quoting *State v. Gonzalez,* 986 A.2d 235, 242 (R.I.2010)) (internal quotation marks omitted).

■ Rule 33 of the Superior Court Rules of Criminal Procedure provides that a trial justice sitting without a jury "on motion of a defendant for a new trial may vacate the judgment, take additional testimony, and direct the entry of a new judgment." "When this Court reviews the denial of a Rule 33 motion in the context of a jury-waived trial, we apply the same deferential standard of review as would be applied to the Superior Court justice's factual findings on the merits." *Adewumi,* 966 A.2d at 1222 (quoting *State v. DiPetrillo,* 922 A.2d 124, 131 (R.I.2007)). Therefore, "[s]uch determinations are entitled to great weight and will not be disturbed unless the trial justice has overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." *Id.*

2

**Discussion**

■ The defendant argues that the trial justice overlooked and misconceived the material evidence, both when she adjudicated defendant guilty and in her decision on the motion for a new trial. He contends that she did not acknowledge evidence such as Jennifer's letter in favor of defendant and other inconsistencies in Jennifer's testimony. Medeiros also maintains that the trial justice overlooked the fact that Jennifer did not come forward with her allegations against him even after he was incarcerated following his July 2004 arrest, which he concludes weakened Jennifer's rationale that she delayed coming forward because she was afraid of him. He further faults the trial justice for not even referring to Jennifer's testimony that defendant sexually assaulted her on July 10, 2004, which clearly was incorrect because defendant was incarcerated on that date. The defendant finally contends that the trial justice's reference to documents that were not in evidence "alone requires the granting of a new trial," despite her statement that she did not rely on them. Finally, he argues that "deference is not due" to the trial justice's decisions because she "overlooked virtually the entire defense."

After carefully reviewing the record and viewing the trial justice's findings of fact and credibility determinations through a prism of deference, as we must, we are of the opinion that the trial justice did not overlook or misconceive the material evidence as defendant contends. We further are satisfied that she appropriately excised from the decision-making process any reference she made to documents that were not in evidence. As a result, we hold that the trial justice did not err when she adjudicated defendant guilty and when she denied his motion for a new trial.

After hearing the testimony of the witnesses and receiving other evidence, the trial justice found Jennifer's testimony to be truthful. She said that she could not perceive any reason "why [Jennifer] would ever manufacture under these circumstances a story about Joseph Medeiros." She found that Jennifer "was absolutely, absolutely devoted to [her two younger brothers], and that remained a moving force in her concealment of the activities."

Although defendant offers several reasons why Jennifer might have fabricated her testimony, from anger over his "relationship" with her best friend or jealousy over the attention her young friend received, the trial justice made credibility determinations and found that such purported motivations did not sway her. Under our deferential standard of review, we decline to disturb those findings on appeal. *See State v. Woods,* 936 A.2d 195, 198 (R.I. 2007) ("We will not interfere with the hearing justice's conclusions with respect to the credibility of the complaining child-witness. We do not have the same vantage point as the presiding judge, and we are unable to assess the witness' demeanor, tone of voice, and body language.").

We do not agree with defendant's argument that the trial justice overlooked documentary evidence and "did not digest or pay attention to any defense witnesses or any defense exhibits." Indeed, the trial justice reviewed the testimony of defendant's mother, which she reiterated did not affect her evaluation of Jennifer and Tanya's credibility. Defense counsel acknowledged that he was "sure [the trial justice] looked at all the exhibits," but he objected to her failure to specifically refer to them in her decision. Nonetheless, the trial justice assured him that she had not overlooked any exhibits and said unequivocally that she had read the DCYF reports and Jennifer's letters "many, many times before trial" and "again before making [her] decision."

We reiterate that the trial justice's findings of fact and credibility determinations are entitled to great weight when we review the denial of a Rule 33 motion in the context of a jury-waived trial. *See Adewumi,* 966 A.2d at 1223. The defendant's motion for a new trial in this jury-waived criminal trial was not accompanied by an offer of newly discovered evidence, and he must overcome a high hurdle in demonstrating that the trial justice abused her discretion when she denied his motion. *See Erminelli,* 991 A.2d at 1070. In our opinion, he did not do so. Therefore, in light of the trial justice's specific assurances that she reviewed all the evidence, and in consideration of her finding that Jennifer's testimony was credible, we cannot say that the trial justice overlooked or misconceived the material evidence or that she otherwise was clearly wrong when she adjudicated the defendant guilty and when she denied his motion for a new trial.

## IV

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of conviction. The record shall be remanded to the Superior Court.