**Supreme Court**

No. 2011-190-C.A.

(N2/09-257A)

State                           :

v.                              :

Mark Ceppi.                     :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                 :

v.               :

Mark Ceppi.         :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, Mark Ceppi, appeals from a judgment of conviction on one count of domestic felony assault, pursuant to G.L. 1956 § 11-5-2 and G.L. 1956 § 12-29-5, and one count of domestic simple assault, pursuant to § 11-5-3 and § 12-29-5, which judgment was entered on August 5, 2010, following a jury-waived trial in the Newport County Superior Court.  The defendant contends that the trial justice erred in denying his motion to dismiss a criminal information, which motion invoked Rule 9.1 of the Superior Court Rules of Criminal Procedure and G.L. 1956 § 12-12-1.7. The criminal information at issue contained two counts, on both of which the defendant was eventually convicted; he posits that the criminal information package was not sufficient to establish probable cause for either of the two counts. He further contends that the trial justice committed a number of evidentiary errors during the course of the trial.  Those errors, according to the defendant, were as follows: (1) finding that certain portions of the testimony of Newport Detective Christopher Hayes were not hearsay and allowing improper bolstering of the testimony of Heather King (the complaining witness) by the

- 1 -

testimony of Det. Hayes; (2) improperly allowing questioning of the defendant with respect to an alleged past incident of violence involving his former wife; (3) impermissibly restricting the defendant's testimony with respect to Ms. King's alleged intoxication; and (4) wrongly allowing Stephanie Bacon, the complaining witness's twin sister, to testify with respect to the complaining witness's injuries.

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction.

## I

### Facts and Travel

On October 6, 2009, defendant was charged by criminal information with domestic felony assault, pursuant to § 11-5-2 and § 12-29-5 (Count One), and domestic simple assault, pursuant to § 11-5-3 and § 12-29-5 (Count Two). Prior to trial, defendant filed a motion to dismiss the criminal information pursuant to Rule 9.1 and § 12-12-1.7, alleging that the criminal information package "failed to establish probable cause." On May 19, 2010, a hearing was held in Superior Court, at the close of which the trial justice denied defendant's motion to dismiss.[1] In due course, a jury-waived trial was held over six days in July and August of 2010. We summarize below the salient aspects of what transpired at trial.

### A

### The Testimony at Trial

#### 1. The Testimony of the Complaining Witness

Heather King, the complaining witness, testified first at the trial. Ms. King testified that she had dated defendant from "either the end of July, 2007 or very early August, 2007" until

---

[1] A more detailed discussion of the contents of the criminal information, the documents attached to it, and the hearing pertaining to the motion to dismiss is provided in Part II.A.1, infra.

May 3, 2009. She further testified that she began living with defendant in January or February of 2009. According to Ms. King's testimony, "a couple of days before" March 17, 2009, she and defendant had an argument; she did not recall what that particular argument was about, but she acknowledged that her arguments with defendant were "usually over jealousy or controlling issues." It was her testimony that, during the course of the March 2009 argument, defendant "punched [her] twice in [her] rib cage."[2] She stated that she heard a "crack" when she was punched in the ribs, and she added that it was confirmed that she had fractured a rib when she eventually had x-rays taken in "early May" of 2009. The March 2009 incident formed the basis of Count Two.

Ms. King next testified that, on May 2, 2009, she and defendant attended a charity event in Boston. It was her testimony that, during the drive home to their residence in Newport, they "pulled over" at a location "close to [Boston]," at which time they were arguing; she added that defendant "hit [her] in the head" in the course of their argument. Ms. King stated that the next morning (May 3, 2009), before defendant woke up, she deleted from his phone the name and phone number of a woman with whom defendant had been talking at the charity event which they had attended the night before. It was her testimony that later that morning defendant asked if she had deleted "numbers from [his] phone" and that she replied in the affirmative. She further testified that, later that same day, after taking one of defendant's sons out for breakfast, she and defendant had a "conversation" about her deletion of the phone number. She stated that "at one point, [she] got upset, [and] walked away and into the bathroom" but that defendant "followed [her] into the bathroom," "locked" the door, and "cornered" her. It was her testimony that defendant "looked at [her] with these crazy eyes" and proceeded to "hit" her "in the

---

[2]     Ms. King proceeded in her testimony to provide a very detailed account of the March 2009 argument, which we need not narrate for the purposes of this appeal.

stomach, the arm, the leg, and then * * * [the] head;" she added that she was hit "five to seven" times and that afterwards she felt as though her head was "going to explode." It was this second incident which formed the basis of Count One.

According to Ms. King's testimony, after the May 3 assault, she felt lethargic and was just "lying in bed" "all day long;" she added, however, that the May 3 incident prompted her to decide to leave defendant.[3] With respect to her injuries, it was her testimony that the symptoms worsened and that, on May 9, 2009, she "woke up, and * * * couldn't lift [her] head up," at which time she went to Newport Hospital. She stated that personnel at Newport Hospital indicated that she had a "brain bleed;" she further stated that she was also told by personnel at Newport Hospital that she was "lucky to be alive" since most people with "the size of [her] hematoma * * * die within twenty-four hours of that injury." Ms. King added that she was told that she would be "rush[ed]" to Rhode Island Hospital. It was her testimony that, at Rhode Island Hospital, she was given the option of going home, which she did, leaving Rhode Island Hospital "late" on May 9, 2009—only to return at 6 a.m. the next morning because she "couldn't stop throwing up." At trial, she remembered spending "more than one day" at Rhode Island Hospital before being released to stay with her sister, Stephanie Bacon, in Rutland, Massachusetts.

Ms. King testified that her symptoms continued to worsen[4] while she was staying with her sister; she stated that she ultimately called her "doctor [in] Rhode Island" and that he said:

---

[3]     It was Ms. King's testimony that, with the help of a friend, she found a place to live and that, on May 4, 2009, she moved out of the residence which she had been sharing with defendant. Jennifer Caffrey, Ms. King's friend, testified at trial and confirmed that she helped Ms. King on May 4, 2009.

[4]     Specifically, Ms. King stated: "[M]y symptoms exacerbated, I was so violently ill, I could not stop throwing up, I couldn't sit [up], I couldn't [lie down], I couldn't do anything."

"'Rush her to [the University of Massachusetts Medical Center] because it's the only level one trauma near you.'" It was her further testimony that, at the University of Massachusetts Medical Center (U. Mass. Medical) located in Worcester, she was diagnosed with a "[s]ubdural hematoma;" she added that she spent "more than a day" at U. Mass. Medical and thereafter returned to work about one month after she was discharged.[5]

We note that the prosecutor submitted into evidence Ms. King's medical records (including her records from Newport Hospital, Rhode Island Hospital, and U. Mass. Medical); and defense counsel, rather than simply acquiescing to their admission by remaining silent, specifically stated to the trial justice that he had no objection. We also note that, at trial, the parties stipulated that Ms. King's subdural hematoma constituted a "serious bodily injury" under § 11-5-2.

### 2.    The Testimony of Stephanie Bacon

Stephanie Bacon, Ms. King's identical twin sister, testified at trial that she visited Ms. King in the hospital in Newport in May of 2009. In her testimony, Ms. Bacon confirmed that her sister's symptoms intensified while she was staying with her in Rutland. Specifically, Ms. Bacon testified that Ms. King was "vomiting uncontrollably" and that her head was filled with pressure "which now we know was the blood on the brain." Her testimony went on to confirm Ms. King's testimony with respect to being admitted to U. Mass. Medical.

During the course of Ms. Bacon's testimony, the prosecutor asked her: "Did you come to find out what kind of injury [your sister] sustained that she needed treatment at the hospital?"

---

[5]    Ms. King's testimony and the testimony of other witnesses at the trial referenced incidences of violence between defendant and Ms. King other than the two for which defendant was charged. For the purposes of this opinion we need not discuss that testimony.

Ms. Bacon responded: "Yes. She had a brain bleed." Defense counsel then said: "Objection to the relevance." The trial justice stated: "It's all right."

### 3. The Testimony of Det. Christopher Hayes

Detective Christopher Hayes of the Newport Police Department testified that on or about May 9, 2009, he learned of an alleged assault on Ms. King; he added that he thereafter drove to Worcester to speak with her while she was at U. Mass. Medical. It was his further testimony that during his visit to U. Mass. Medical he spoke with one of Ms. King's physicians, who told him that Ms. King had a subdural hematoma and that the possibility of performing surgery on her was being debated. During his testimony, Det. Hayes also indicated that Ms. King named defendant as her assailant.

After Det. Hayes had testified that one of Ms. King's physicians told him she had a subdural hematoma, the following exchange took place:

> "[**The State**]: Did you, during your investigation, have a chance to inquire as to what injuries she, Ms. King, was diagnosed with when you went to see her?
>
> "[**Detective Hayes**]: Yes.
>
> "[**The State**]: What injuries?
>
> "[**Detective Hayes**]: We were told by her physician –
>
> "[**Defense Counsel**]: Objection
>
> "[**The Court**]: There is going to be medical evidence, so you may answer, Detective Hayes."

Detective Hayes proceeded to indicate in his testimony that, in addition to the just-referenced statements made to him by Ms. King's physician with respect to her medical condition, Ms. King herself told him, when he took her statement at U. Mass. Medical, that, in addition to the

subdural hematoma, she had "sustained some fractured ribs." The direct examination then proceeded as follows:

> "[**The State**]: Did she give you a time frame or marker as to when allegedly this occurred?
>
> "[**Defense Counsel**]: Objection.
>
> "[**The Court**]: On that point, it's all right. You may answer, Detective.
>
> "[**Detective Hayes**]: Within the last several months.
>
> "[**The State**]: And did she tell you as to how she sustained those injuries?
>
> "[**Detective Hayes**]: Yes.
>
> "[**The State**]: Did she tell you who did those injuries to her?
>
> "[**Detective Hayes**]: She said Mark had assaulted her.
>
> "[**Defense Counsel**]: Same objection, Your Honor.
>
> "[**The Court**]: Understood. So noted."

### 4.     The Testimony of Defendant

The defendant was the final witness to testify. He testified that, at some point in time after about the first eight months of his relationship with Ms. King, she became very "controlling" and "jealous." He replied in the affirmative when asked if "Ms. King's jealousy * * * manifest[ed] itself into anything physical against [him]."

He proceeded to testify with respect to an incident between Ms. King and him that allegedly took place at some time on the evening of September 11, 2008 or the early morning hours of September 12 of that year (dates which do not relate to Count One or Count Two in the instant case). Defense counsel asked: "Had you observed Ms. King become intoxicated from alcohol before September 12th, 2008?" The prosecutor objected and the trial justice told defense

- 7 -

counsel that he was asking defendant "for a conclusion" and that he needed to refine his question. After a few more questions were posed, the following exchange took place:

> "[**Defense Counsel**]: Okay. And after consuming these vodka drinks, could you notice with Heather King, that evening, whether or not she was under the influence from alcohol.

> "[**The State**]: Objection.

> "[**The Court**]: It's the same objection, asking for conclusion. What he observed, please."

Subsequently, defendant testified that, after Ms. King consumed the above-referenced drinks on September 11, 2008, she became "very aggressive," "very controlling," and "would easily get mad about little things."

Defense counsel's questioning eventually moved to the events in March of 2009 that gave rise to the domestic simple assault charge. The defendant testified that he and Ms. King had gone to a "restaurant/bar" across the street from their residence, where Ms. King started arguing with a woman who she believed was "flirting with" defendant. It was defendant's testimony that he left the restaurant and returned to the residence which he shared with Ms. King. He added that she also came back to the residence about five to ten minutes later and was "yelling, [and] screaming"—only to leave again to return to the previously mentioned bar/restaurant. It was defendant's further testimony that, another five to ten minutes later, Ms. King once again appeared at their residence. The defendant stated that, at that time, he was in the "spare bedroom" and that he locked the door of that room. According to defendant's testimony, Ms. King started "yelling, screaming, and ramming the door;" he stated that she rammed the door about ten times before he opened it.[6] He added that the next day Ms. King complained that her ribs were hurting. On cross-examination, defendant acknowledged that Ms.

---

[6] Ms. King, in her testimony, denied having rammed the door.

King did not complain of shoulder, elbow, wrist, or arm pain, despite the fact that she had allegedly sustained a fractured rib due to ramming the "spare room" door.

Addressing next the events of May 2 and 3, 2009 which gave rise to the felony assault charge, defendant testified that Ms. King had been drinking during the charity event in Boston and became "angry" due to the fact that he talked to two women at the event and exchanged phone numbers with one of them. He testified that, on the drive back to Newport, he and Ms. King stopped at a McDonald's to get some food and that, during a "struggle over the keys," Ms. King bit his thumb. The defendant acknowledged that the next day Ms. King complained of a headache. However, he denied ever hitting Ms. King in the bathroom.[7] He stated that he spoke to Ms. King on the phone on the night of May 3, 2009 and that he told her that they should not see each other anymore; he added that Ms. King was "very upset" by what he said.

During cross-examination, the prosecutor asked defendant: "And according to your testimony is that [sic] you never laid a hand on Ms. King, right?" The defendant responded to that question in the negative. The prosecutor then asked defendant if he was "not violent," and he replied that he was not violent. The prosecutor then proceeded to question defendant with respect to an "altercation" that he once had with his former wife. The defendant admitted to the altercation with his former wife. Defense counsel seasonably objected to the questions regarding Mr. Ceppi's "altercation" with his former wife and made a "general objection" to any questioning related to any incidents of violence between defendant and his former wife, stating that "there's no [R.I. R. Evid.] 404(b) exception, I believe, that fits into this evidence." Over defense counsel's objection, the trial justice permitted questions about the altercation as long as they did not make reference to observations made by Mr. Ceppi's two children. The prosecutor

---

[7]    The defendant denied that any physical confrontation had taken place between him and Ms. King on May 3, 2009.

continued to question defendant regarding any arguments with his former wife which had become physical. In answering those questions, defendant denied kicking or hitting his former wife; he stated: "I never touched her in eighteen years." On redirect, defendant stated that his former wife was charged with assault and battery against him in connection with an altercation that took place on March 10, 2009.

**B**

**The Ensuing Verdict and Sentencing**

On August 5, 2010, the trial justice issued her bench decision; she found Ms. King to be "candid," "forthright," and "totally credible." As a result, she found defendant guilty beyond a reasonable doubt on both Count One and Count Two. On March 8, 2011, defendant was sentenced on Count One to ten years with two years to serve and the remainder suspended, with probation. The trial justice also sentenced him to a concurrent term of one year to serve on Count Two. The defendant filed a notice of appeal on the same day. Judgment of conviction was entered on March 29, 2011.

**II**

**Analysis**

**A**

**Motion to Dismiss the Criminal Information**

**1.   The Criminal Information & The Trial Justice's Denial of Defendant's Motion to Dismiss**

The criminal information charged defendant with one count of "assault and battery upon Heather King resulting in serious bodily injury" and one count of assaulting Ms. King. Attached to the criminal information was a form entitled "CRIMINAL INFORMATION FACE SHEET,"

which listed the exhibits attached to the criminal information.  The list is typewritten except for one notation which is written by hand in blue pen.  The list appears in pertinent part as follows (with the handwritten portion being indicated by the use of boldface type):

> "Exhibit No. 1   Affidavit Sworn to by
>
>                         (Name of Officer)
>
> "Exhibit No. 2   Police Narrative
>
> "Exhibit No. 3   Statement of Heather King
>
> "Exhibit No. 4   Affidavit and Arrest Warrant Det. Hayes
>
> "Exhibit No. 5   Statement of Det. Christopher Hayes
>
> "Exhibit No. 6   Photographs of Victim
>
> "Exhibit No. 7   E-Mail Correspondence from Heather King
>
> "Exhibit No. 8 Medical Records**—Copy given upon Defense request**
>
> "Exhibit No. 9   Miscellaneous Police Reports"

With the exception of the medical records, all of the exhibits referenced in the above-quoted list were attached to the criminal information.  On October 20, 2009, defendant filed a motion to dismiss Count One in the criminal information; his motion invoked Rule 9.1 of the Superior Court Rules of Criminal Procedure[8] and § 12-12-1.7.[9]  In that motion, defendant contended that

---

[8]      Rule 9.1 of the Superior Court Rules of Criminal Procedure reads as follows:

> "A defendant who has been charged by information may, within thirty (30) days after he or she has been served with a copy of the information, or at such later time as the court may permit, move to dismiss on the ground that the information and exhibits appended thereto do not demonstrate the existence of probable cause to believe that the offense charged has been committed or that the defendant committed it. The motion shall be scheduled to be heard within a reasonable time."

[9]      General Laws 1956 § 12-12-1.7 reads in pertinent part as follows:

"the state ha[d] failed to establish probable cause within the four corners of the information package." On November 13, 2009, defendant filed an amended motion to dismiss,[10] in which he contended that both counts in the criminal information should be dismissed because the state had failed to establish probable cause. In his memorandum in support of his motion to dismiss, defendant argued that the "nature and extent of the injuries specified in the information package [did] not constitute 'serious bodily injury,'" (which is required under § 11-5-2, the violation of which was alleged in Count One). The defendant's memorandum stated: "Even if [the court] assumes that Ms. King sustained a subdural hematoma as a result of the alleged May 3, 2009 assault, there is nothing within the witness statements, police reports or medical records to suggest that [that] injury constituted" serious bodily injury.[11] With respect to Count Two, defendant argued that the criminal information package lacked any "reference to an assault taking place on March 17, 2009" or any "eyewitness accounts."

The trial justice conducted a hearing on May 19, 2010, at which the attorneys for both the state and defendant presented arguments; at the end of that hearing, the trial justice rendered a

---

> "Within thirty (30) days after a defendant is served with a copy of an information charging him or her with an offense, he or she may move in the superior court to dismiss the information on the ground that the information and exhibits appended to it do not demonstrate the existence of probable cause to believe that the offense charged has been committed or that the defendant committed it."

[10] Neither party has contested the timeliness vel non of the amended motion to dismiss; and, therefore, we do not address that issue.

[11] In his memorandum in support of his motion to dismiss the criminal information, defendant specifically referenced the medical records which he contends should have been attached to the information. In that memorandum, he began his discussion of one particular issue with the following introductory clause: "According to the medical records contained in Exhibit 8 * * * ." Thus, it is clear defendant had access to the medical records either when the criminal information was filed or soon thereafter.

decision from the bench denying defendant's motion. In her thorough decision, the trial justice began by observing that the "threshold to support probable cause is very low" and stating that she must "draw inferences * * * in the light most favorable to the State." She held, with respect to Count Two, that there was "a substantial credibility issue" because the only account of the alleged assault contained in the criminal information package was from Stephanie Bacon, the sister of the complaining witness. However, according to the trial justice, "it is permissible for an information package to include and to rely upon an assessment of probable cause hearsay information from identified or otherwise reliable sources." Accordingly, the trial justice denied defendant's motion to dismiss with respect to Count Two.

Moving on to Count One, the trial justice, relying on this Court's opinion in State v. Clark, 974 A.2d 558 (R.I. 2009), stated that this Court has held that "factual matters must be imposed [on] a factfinder who is hearing evidence." She proceeded to deny defendant's motion to dismiss, ruling as follows:

> "So the [c]ourt feels that because of the dictates of the Supreme Court's allocation of proof, if you will, and a determination that certain issues must be heard and can only be heard by the factfinder in an evidentiary setting, the [c]ourt is compelled to deny the motion to dismiss for lack of probable cause."

The defendant contends that the trial justice's decision to deny his motion to dismiss was in error.

### 2. Standard of Review

When confronted with a motion to dismiss a criminal information, the Superior Court is "'required to examine the information and any attached exhibits to determine whether the state has satisfied its burden to establish probable cause * * * .'" State v. Martini, 860 A.2d 689, 691 (R.I. 2004) (quoting State v. Fritz, 801 A.2d 679, 682 (R.I. 2002)); see State v. Reed, 764 A.2d

144, 146 (R.I. 2001); State v. Jenison, 442 A.2d 866, 875 (R.I. 1982). In making a probable cause determination, the trial justice is limited to the "four corners" of the criminal information package and must "allow the state the benefit of every reasonable inference." State v. Baillargeron, 58 A.3d 194, 197, 198 (R.I. 2013) (internal quotation marks omitted). "The probable-cause standard to be applied is the same as that for arrest." Jenison, 442 A.2d at 875 (internal quotation marks omitted). Under that standard, "[p]robable cause exists when the facts and circumstances within the police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a reasonable person's belief that a crime has been committed and that the person to be arrested has committed the crime." Baillargeron, 58 A.3d at 197-98 (internal quotation marks omitted).

When reviewing a decision by a trial justice on a motion to dismiss a criminal information, we determine whether the trial justice's "findings are supported by the evidence or whether, in making those findings, the [trial] justice misconceived or overlooked material evidence." Martini, 860 A.2d at 691 (internal quotation marks omitted); see State v. Ouimette, 415 A.2d 1052, 1053 (R.I. 1980). We accord "great weight to a trial justice's probable-cause findings; we will not set them aside 'unless they are clearly erroneous or fail to do justice between the parties.'" Reed, 764 A.2d at 146 (quoting State v. Aponte, 649 A.2d 219, 222 (R.I. 1994)). However, "we are required to make an independent examination of the record when there is a possibility that the defendant's constitutional rights have been violated."[12] Jenison, 442 A.2d at 875.

---

[12] The defendant seems to contend that his constitutional rights are implicated in this case because the Fourth Amendment "requires that a neutral and detached magistrate make a probable-cause determination before a defendant can be subjected to an extended restraint of liberty following arrest." (Internal quotation marks omitted.) However, in this case, a neutral

### 3. Discussion

The defendant posits that this Court should not review a motion to dismiss a criminal information in the same manner in which it reviews a motion to dismiss a grand jury indictment, and he avers that, unlike in cases involving a motion to dismiss a grand jury indictment, the fact that he was ultimately found guilty on both counts charged in the criminal information in the instant case should not render any errors in the criminal information harmless beyond a reasonable doubt. The defendant relies heavily on State v. Aponte, 649 A.2d 219 (R.I. 1994) in support of his contention.

In order to properly address defendant's argument, we deem it necessary to discuss the well-established law in this jurisdiction relative to this Court's review of a motion to dismiss a grand jury indictment. We have stated that "dismissal of an indictment on review is an extraordinary sanction" and that, therefore, it is "reserved for very limited and extreme circumstances." State v. Simpson, 658 A.2d 522, 524 (R.I. 1995) (internal quotation marks omitted); see State v. Huffman, 68 A.3d 558, 567 (R.I. 2013). Very importantly, however, we have repeatedly held that a "conviction by a * * * jury[13] after a full trial on the merits renders harmless any defect occurring during the grand jury proceedings."[14] Simpson, 658 A.2d at 524;

and detached Superior Court justice did make a probable cause determination when the trial justice denied defendant's motion to dismiss the criminal information.

[13] Although our case law references conviction following a jury trial, we can discern no reason why the principles that we have articulated with respect to that context would not also apply to cases such as this one where a jury-waived trial was conducted.

[14] It is worth noting that this rule is not absolute. As the United States Supreme Court noted in United States v. Mechanik, 475 U.S. 66 (1986), certain errors or deficiencies in a grand jury proceeding (none of which are at issue in this case), such as racial discrimination in the composition of the grand jury, would not be rendered harmless beyond a reasonable doubt by a subsequent guilty verdict. Id. at 70-71 n. 1; see also State v. Martin, 68 A.3d 467, 478 (R.I. 2013) (stating that "some fundamental flaws in the grand jury process, such as race and gender

see State v. Martin, 68 A.3d 467, 478 (R.I. 2013); State v. Stone, 924 A.2d 773, 782 (R.I. 2007); State v. Tempest, 660 A.2d 278, 280 (R.I. 1995). In so holding, we followed a conceptual route that paralleled the one followed by the United States Supreme Court in United States v. Mechanik, 475 U.S. 66, 70 (1986). In that decision the Supreme Court held that a subsequent guilty verdict "means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt" and that, therefore, the guilty verdict rendered "any error in the grand jury proceeding * * * harmless beyond a reasonable doubt." Id.

The state contends that our case law with respect to the dismissal of a grand jury indictment should also be applied to a motion to dismiss a criminal information. In our judgment, the state's argument in this regard is eminently sensible, and we shall hew to it. If, as is the well-established rule, errors in a grand jury proceeding are rendered harmless beyond a reasonable doubt by a subsequent guilty verdict on the same charge, it follows inexorably that errors in a criminal information should be rendered harmless beyond a reasonable doubt by a subsequent guilty verdict on the same charge. That conclusion seems even more appropriate in light of the fact that a trial justice, ruling on a Rule 9.1 motion to dismiss a criminal information, is performing essentially the same function as a grand jury—namely, assessing whether or not there is probable cause to believe that the defendant committed the crime being charged. We are convinced that, since the same function is being performed in each instance, the same legal principles should be applicable.[15]

---

discrimination in the grand jury selection process, require automatic dismissal of an indictment") (internal quotation marks omitted).

[15] The defendant suggests that a motion to dismiss a criminal information is more aptly compared to a motion to suppress evidence than to a motion to dismiss a grand jury indictment.

Our conclusion is not altered by the case on which defendant relies so heavily, State v. Aponte, 649 A.2d 219 (R.I. 1994). Contrary to defendant's contention, Aponte does not stand for the proposition that a defect in a criminal information is not rendered harmless even when there is a subsequent guilty verdict on the same charge following a trial. Id. at 222. In Aponte, the defendant was charged by criminal information with assault with intent to rob and possession of a weapon not a firearm, and eventually he was convicted on both charges after a jury trial. Id. at 221. On appeal, the defendant argued that the trial justice erred by denying his Rule 9.1 motion to dismiss the charge of possession of a weapon not a firearm contained in the criminal information filed against him. Aponte, 649 A.2d at 222. This Court quickly disposed of the defendant's contention (in a single paragraph) by holding that "[t]he evidence clearly established probable cause." Id. We made no determination in Aponte as to whether or not this Court's precedent with respect to a motion to dismiss a grand jury indictment and a subsequent guilty verdict should be applied to a motion to dismiss a criminal information. Id. Consequently, defendant's reliance on Aponte is unavailing.

Accordingly, it is our holding that any deficiency that may have existed in the criminal information package (including a lack of medical records) in this case does not rise to the level of an absence of probable cause and was harmless beyond a reasonable doubt—in light of the fact that, following a trial, defendant was eventually found guilty on both counts charged in the criminal information.[16]

---

However, we can perceive no reason why a comparison to a motion to suppress would be the more appropriate analytical approach.

[16] The defendant also makes a number of arguments with respect to the alleged lack of probable cause to support the criminal information. Given our holding that the guilty verdicts on Count One and Count Two cured any defect in the criminal information package, we need not examine the merits of the Superior Court's probable cause determination.

**B**

**Evidentiary Issues**

The defendant contends that there were a number of evidentiary rulings that were in error at his trial. It is a general rule that "[w]e will not disturb a trial justice's evidentiary ruling without first determining that the ruling constitutes a clear abuse of his or her discretion." State v. Johnson, 13 A.3d 1064, 1066 (R.I. 2011); see State v. McManus, 990 A.2d 1229, 1234 (R.I. 2010); State v. Reyes, 984 A.2d 606, 614-15 (R.I. 2009); see also Votolato v. Merandi, 747 A.2d 455, 460 (R.I. 2000) ("[A] court by definition abuses its discretion when it makes an error of law."). Moreover, we "will not disturb the trial justice's ruling unless the abuse of discretion resulted in prejudicial error." State v. St. Michel, 37 A.3d 95, 100 (R.I. 2012); see State v. Gabriau, 696 A.2d 290, 294 (R.I. 1997).

Bearing in mind our deferential standard of review, we shall address each of defendant's contentions in turn.

**1.    The Testimony of Det. Christopher Hayes**

The defendant first contends that portions of the testimony of Det. Hayes were both hearsay and impermissible bolstering. Specifically, he argues that it was error on the part of the trial justice not to sustain defense counsel's objection to the testimony of Det. Hayes with respect to what Ms. King's physician told him about her condition and with respect to what Ms. King told him about who was responsible for the injuries she sustained as a result of the assault forming the basis of Count Two.[17]

---

[17]    We refer the reader to Part I.A.3, supra, for a detailed account of the testimony of Det. Hayes that is being challenged by defendant.

The state counters that, although the statements by Det. Hayes with respect to what he was told by Ms. King and her physician would "appear to constitute hearsay," their admission was "harmless error at best" because the same information was admitted as a part of Ms. King's testimony and was contained in her medical records, which were entered as an exhibit at trial. The state also points out that the fact that this was a jury-waived trial "substantially diminished" the risk of unfair prejudice. Moreover, the state argues that the testimony of Det. Hayes was clearly not bolstering because he never testified regarding any determination on his part as to the credibility of either Ms. King or her physician.[18]

We address first the issue of hearsay. It has long been established in this jurisdiction that "the admission of hearsay evidence is not prejudicial when the evidence is merely cumulative and when defendant's guilt is sufficiently established by proper evidence." State v. Lynch, 854 A.2d 1022, 1032 (R.I. 2004) (internal quotation marks omitted); see State v. Micheli, 656 A.2d 980, 982 (R.I. 1995). We have defined "cumulative evidence as evidence that tends to prove the same point to which other evidence has been offered." State v. Lomba, 37 A.3d 615, 622 n. 7 (R.I. 2012) (internal quotation marks omitted). When assessing whether or not a piece of evidence is cumulative, "the test is a retrospective one, administered at the close of all the evidence to determine whether the admission of certain evidence was harmless in light of all the evidence admitted on that point." State v. Robinson, 989 A.2d 965, 979 (R.I. 2010).

Our review of the record confirms the state's contention that, even if the testimony of Det. Hayes was hearsay, it was merely cumulative and therefore harmless. Ms. King herself testified with respect to her injuries that resulted from the incident which formed the basis of

---

[18] The state argues that defendant may not raise the bolstering issue on appeal because at trial his objections failed to mention bolstering, and it contends that defendant's "non-specific" objection was not sufficient to preserve the issue for appeal. We need not even address this issue, given that Det. Hayes's testimony was so clearly not improper bolstering.

Count Two and with respect to the fact that defendant was the individual who she alleged inflicted those injuries. Moreover, any testimony by Det. Hayes with respect to the statements of Ms. King's physicians was clearly cumulative since exactly the same information was admitted when Ms. King's medical records were entered as an exhibit. The state is also correct that any potential prejudice would have been "substantially diminished" by the fact that this was a jury-waived trial. State v. Medeiros, 996 A.2d 115, 121 (R.I. 2010).

We next turn to the issue of bolstering. Impermissible bolstering occurs typically "when one witness offers an opinion concerning the truthfulness of the testimony of another witness." State v. Hazard, 797 A.2d 448, 470 (R.I. 2002) (internal quotation marks omitted). However, impermissible bolstering can also occur "[e]ven when a witness does not literally state an opinion concerning the credibility of another witness but his or her testimony would have the same substantive import." State v. Richardson, 47 A.3d 305, 315 (R.I. 2012) (internal quotation marks omitted). We recognize that a police officer's testimony may be given more credence by some jurors than the testimony of a lay person; however, we are simply unable to detect any reason why the testimony of Det. Hayes in this case could be considered improper bolstering. Detective Hayes merely repeated what was told to him by Ms. King and her physician. He did not make any indication of any kind (even of the most minor variety) with respect to his personal opinion about the veracity of their statements. Thus, we hold that no improper bolstering occurred.

Accordingly, defendant's contentions of error with respect to the testimony of Det. Hayes do not carry the day.

## 2. The Testimony of the Defendant

### i. Questions Regarding Defendant's Conduct with his Former Wife

The defendant's next contention is that he was improperly asked a number of questions about an alleged past incident of violence involving his former wife. In order to properly assess defendant's contention, we must detail the pertinent exchange, which occurred during cross-examination:

> "[**The State**]: And according to your testimony is [sic] that you never laid a hand on Ms. King, right?
>
> "[**The Defendant**]: No.
>
> "[**The State**]: Because you're, I believe your words were, that you're not violent, right?
>
> "[**The Defendant**]: I'm not.
>
> "[**The State**]: Well, this is – isn't the first time that you were accused of hitting someone in the left side of the head, is it?
>
> "[**Defense Counsel**]: Objection, Your Honor.
>
> "[**The Court**]: Sustained.
>
> "[**The State**]: You never hit your ex-wife on the left side of the head, sir?
>
> "[**Defense Counsel**]: Objection
>
> "[**The Defendant**]: No.
>
> "[**The Court**]: He denied it.
>
> "[**The State**]: You never gave her a bloody nose, sir?
>
> "[**Defense Counsel**]: Objection, Your Honor.
>
> "[**The Court**]: He denied ever striking her.
>
> "[**The State**]: You never got into a physical altercation with your wife that your children had to pull you apart?

"[**Defense Counsel**]: Same objection, Your Honor.

"[**The Court**]: An altercation, you may answer that, Mr. Ceppi.

"[**The Defendant**]: Yes.

"[**The State**]: In fact, it was an altercation that your – [sons] were present for, right?

"[**The Defendant**]: Yes.

"[**Defense Counsel**]: And they were pulling you and their mother apart, right?

"[**The Defendant**]: Their mother.

"[**Defense Counsel**]: They weren't pulling you apart?

"[**The Defendant**]: No.

"[**Defense Counsel**]: So – so [one of your sons] would be wrong if he stated to the police – to Shrewsbury, Mass. You were antagonizing their mother?

"[**Defense Counsel**]: Objection.

"[**The Court**]: [State], do you have an offer of proof in this?"

The prosecutor then made an offer of proof by presenting a police incident report, and the trial

justice ruled on the objection as follows:

> "[**The Court**]: "[W]ith reference to the incident report, March 10th, 2009, that report includes, under the introductory section, incidents on November 16th 2008, August 16th, 2008, followed by a nonspecific, a nonspecific date referenced to the bloody nose that you're talking about. With reference to the March 10th incident, the report seems to indicate that the children reported to the officers that the wife – that Susan Ceppi became physical with Mr. Ceppi and started throwing things and that officers viewed a tape showing Susan, quote, becoming physically violent towards Mark and the children trying to restrain their mother, asking her to stop, followed by an admission by Susan Ceppi that she did become violent towards her husband, Mark.

So with reference to your last question, the objection is sustained. With reference to – you need to separate the other references by Mrs. Ceppi that do not include your question about [both sons'] observations on this last date of March 10th.

"[**The State**]: Thank you, Your Honor.

"[**Defense Counsel**]: And if I may, Your Honor, just to -- just for the record, I would make a general objection to anything --

"[**The Court**]: I understand.

"[**Defense Counsel**]: -- any questioning related to these incidents."

"[**The Court**]: Sure.

"[**Defense Counsel**]: For the mere fact that there's no [Rule] 404(b) exception, I believe, that fits into this evidence. Thank you."

The prosecutor proceeded to ask questions with respect to whether defendant had ever "hit" or "kicked" his former wife. The defendant avers that "[t]he prosecutor was in effect accusing [him] of an assault on his former wife, even though the prosecution's offer of proof included a police report which contained an admission by the defendant's former wife that she assaulted the defendant." He posits that the "impermissible implication that [defendant] had engaged in violent conduct with his former wife" was inadmissible under Rule 404(b) of the Rhode Island Rules of Evidence.

In accordance with Rule 404(b), any evidence of "other crimes, wrongs, or acts" committed by defendant was not admissible to prove that defendant had a certain character and acted in accordance with his character (i.e., propensity evidence) when allegedly committing the crimes with which he was charged.[19] Our thorough review of the record indicates that, even if

---

[19] Rule 404(b) of the Rhode Island Rules of Evidence reads, in its entirety, as follows:

the questions with respect to defendant's former wife were in violation of Rule 404(b), such a violation would have been harmless beyond a reasonable doubt. See State v. Clements, 83 A.3d 553, 563 (R.I. 2014) (concluding that, even if there had been a violation of Rule 404(b), it would have been "harmless beyond a reasonable doubt"); see also State v. Bailey, 677 A.2d 407, 411 (R.I. 1996). No documents with respect to any altercation between defendant and his former wife were admitted into evidence; and, in his testimony, defendant repeatedly denied ever kicking or hitting his former wife. Importantly, defendant was also given an opportunity during re-direct examination to testify that it was his then-wife, and not he, who was charged with respect to the alleged violent confrontation at issue. Additionally, as the state points out, this was a jury-waived trial—and the risk of prejudice is significantly reduced in that context. See Medeiros, 996 A.2d at 121. Moreover, the above-quoted comments by the trial justice make it clear that she understood that it was not defendant who had been charged with respect to the incident involving his former wife. Taking all those facts into account, we hold that, even if the questioning with respect to defendant's former wife and any violent altercations between them had been in violation of Rule 404(b), such error would have been harmless.

### ii.     The Opinion of Defendant as to the Intoxication of the Complaining Witness

The defendant contends that the trial justice "erroneously refused to allow him to testify that [Ms. King] was under the influence of alcohol" on direct examination. He refers specifically to questions asked by defense counsel with respect to whether or not defendant had observed Ms.

---

> "Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

King become intoxicated in the past and whether she was under the influence of alcohol on a particular evening.[20] With respect to those questions the trial justice instructed defense counsel to ask the witness about his observations, not his "conclusion[s]." The defendant avers that the fact that he had been dating Ms. King for "ten months" was "adequate foundation" for the questions, and he contends the following: "This Court has said lay opinions of intoxication are permitted if the witness has had an adequate opportunity to observe the person about whom the testimony is offered and is able to offer a [sic] sufficient detail for an opinion."

We note that the trial justice did not in fact exclude all testimony with regard to Ms. King's intoxication on various dates in question; rather, she simply required defendant to testify with respect to what he observed about Ms. King, rather than simply offering a conclusory statement that she was intoxicated. That requirement imposed by the trial justice was consistent with the relevant case law from this Court cited by defendant. See State v. Bruskie, 536 A.2d 522, 524 (R.I. 1988); State v. Fogarty, 433 A.2d 972, 975-76 (R.I. 1981). In our decision in Fogarty, we held that a lay witness may testify with respect to whether or not someone was intoxicated if the witness "had an opportunity to observe the person and [can provide] the concrete details on which the inference or description is founded." Fogarty, 433 A.2d at 976. The trial justice in the instant case was merely requiring defense counsel to ask about the "concrete details" which formed the basis of his conclusion that Ms. King was intoxicated. Id.; see also State v. Gomes, 604 A.2d 1249, 1258-59 (R.I. 1992) (holding that a portion of a deposition which was not read into evidence at trial due to the fact that the trial justice sustained the prosecutor's objection to that portion, in which the witness stated that a certain individual

---

[20] See Part I.A.4, supra.

was intoxicated, was properly excluded because the witness failed to provide any concrete "details" on which his determination was based).

Moreover, defense counsel was permitted to continue asking questions about defendant's observations of Ms. King's behavior after she was drinking, and defendant was permitted to testify with respect to Ms. King's behavior when she had been drinking. Therefore, there is no merit to defendant's argument that the trial justice "erroneously refused to allow him to testify that [Ms. King] was under the influence of alcohol."

### 3. The Testimony of Stephanie Bacon

The defendant objects on appeal to the complaining witness's sister having been permitted to testify that Ms. King had a "brain bleed" because, according to defendant, that statement was hearsay and was "not probative."

Any contention as to Ms. Bacon's testimony constituting hearsay is not properly before this Court since no objection on that basis was articulated before the trial justice.[21] See State v. Figuereo, 31 A.3d 1283, 1289 (R.I. 2011) ("This Court staunchly adheres to the 'raise or waive' rule, which requires parties to raise an issue first in the trial court before raising it on appeal."). Additionally, even if Ms. Bacon's testimony was not relevant, it was quite clearly cumulative in view of the fact that Ms. King's medical records were admitted into evidence and Ms. King was allowed to testify as to her injuries. See Lynch, 854 A.2d at 1032. As a result, the trial justice did not abuse her discretion in allowing Ms. Bacon to testify regarding her sister's injury.[22]

---

[21] Defense counsel specifically stated: "Objection to the relevance." See Part I.A.2, supra, for further details relative to the testimony by the complaining witness's sister.

[22] The defendant has raised two additional contentions on appeal. The first contention apparently urges that it was error for the trial justice to sustain an objection to a question by defense counsel to Ms. King during cross-examination as to whether or not she "work[ed] out[.]" However, only four lines in defendant's brief address this contention. And in those four lines defendant does not cite a single case, nor does he clearly articulate his argument concerning the

Thus, we hold that the trial justice did not commit any errors with respect to the evidentiary rulings at trial which would merit reversal.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction.   The record in this case may be remanded to that tribunal.

---

objected-to question.  As such, this issue is waived.  See Wilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n. 1 (R.I. 2002) ("Simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue."); see also Horton v. Portsmouth Police Department, 22 A.3d 1115, 1130 (R.I. 2011).

The second contention is that the cumulative effect of the evidentiary errors supports reversal.  Given our conclusion that any evidentiary errors that may have occurred were harmless, we need not address that contention.  See Cheaters, Inc. v. United National Insurance Co., 41 A.3d 637, 646 (R.I. 2012); see also Furlan v. Farrar, 982 A.2d 581, 585 (R.I. 2009).



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     State v. Mark Ceppi.

**CASE NO:**     No. 2011-190-C.A.
(N2/09-257A)

**COURT:**     Supreme Court

**DATE OPINION FILED:**  May 28, 2014

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**     Newport County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Melanie Wilk Thunberg

**ATTORNEYS ON APPEAL:**

For State:  Christopher R. Bush
                   Department of Attorney General

For Defendant:  Robert B. Mann, Esq.