November 30, 2018

**Supreme Court**

No. 2015-86-C.A.
No. 2016-138-C.A.
(P2/12-2771A)

State      :

v.       :

Patrick Cahill.    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                               :

v.                                  :

Patrick Cahill.                     :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  The defendant, Patrick Cahill, was found guilty of second-degree child abuse, in violation of G.L. 1956 § 11-9-5.3(b)(2), by a Superior Court trial justice sitting without a jury in Providence County.  The trial justice sentenced him to ten years' imprisonment, with six months to serve and the remainder suspended, with probation.  The defendant now appeals from the judgment of conviction, arguing that the trial justice erred by (1) allowing opinion testimony by a witness not tendered as an expert; (2) failing to consider simple assault as a lesser-included offense to second-degree child abuse; and (3) denying defendant's motion for a new trial.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

**I**

**Facts and Procedural History**

The defendant was charged with one count of second-degree child abuse stemming from an incident with his half-sister.  He waived his right to a jury trial, and a trial commenced before a justice of the Superior Court on September 22, 2014.  The state called four witnesses:

- 1 -

complaining witness Abigail; her sister, Beth; her mother, Danielle;[1] and Dana Kaplan, M.D. The defendant presented two witnesses: himself and his girlfriend, Amanda Paquette (Paquette). Their testimony is summarized below.

**A**

**Testimony**

**1**

**Abigail and Beth**

Abigail testified that, on August 20, 2012, her mother, Danielle, dropped her and her sister Beth at their father's house in Woonsocket on Danielle's way to work.[2]  The defendant is half-brother to Abigail and Beth; the three share the same biological father.  Abigail and Beth lived with their mother and grandmother in Burrillville after their mother and father separated. Both Abigail and Beth testified that they had a normal sibling relationship with defendant and, for the most part, got along well with defendant.

A short time after arriving at the house, the girls discovered that defendant was at home, and they went downstairs to defendant's room.  Beth testified that she stayed in defendant's room for only a short time before returning upstairs to finish watching a television show, but that Abigail remained with defendant to watch television and watch defendant exercise.  At some point, Beth testified, Abigail returned upstairs to ask Beth if she could go outside and play with the girl next door.  Beth told Abigail that it was "up to [defendant.]"  Abigail testified that she then returned to defendant's room to ask him if she could go outside, but that defendant said no.

---

[1] We will use pseudonyms when referring to the complaining witness and her sister to protect their privacy. For similar reasons, we refer to their mother by her first name; no disrespect is intended.

[2] Abigail was nine years old on the day of the incident and eleven years old at the time of trial. Beth was fourteen years old on the day of the incident and sixteen years old on the date of her trial testimony.

Abigail, unhappy with defendant's answer, ran up the stairs and out of the house. Abigail recalled seeing defendant's girlfriend, Paquette, when she ran outside. Abigail testified that she ran around and attempted to get in Paquette's locked car; she was "scared" because defendant was chasing her. Beth testified that she saw Abigail running up the stairs, with defendant following behind her. She also heard both Abigail and defendant yelling as they ran outside. Beth further testified that she heard defendant tell Abigail to "get back over here" and that he "is the boss."

The defendant eventually caught up with Abigail at Paquette's car, according to Beth. Abigail testified that defendant then grabbed her hair, which was in a high ponytail, and pulled it straight up. Abigail testified that it hurt when defendant grabbed her ponytail and that defendant did not let go of her hair as he "pulled [her] into the house." Beth testified that she stood on the steps of the house, about twenty-eight to thirty feet away from Abigail, and watched defendant grab and pull Abigail into the house by her ponytail. Beth recalled that Abigail was crying while defendant held on to her ponytail.

According to Abigail, once inside the house, defendant "threw [her] on the couch" in the living room and let go of her ponytail. Next, defendant placed his knee on her chest and stomach area, which Abigail testified gave her a "sharp pain[.]" According to Abigail, defendant then grabbed and squeezed her cheeks with one hand and placed his other hand on her throat as she continued to cry. Although Abigail could not recall how hard defendant squeezed her cheeks, she said that it hurt "[a] little bit." As for the hand on her throat, Abigail testified that defendant "pushed down a little bit[,]" and that his hand was "a little tight" on her neck. Abigail testified that at this time she was still crying and had "[a] little bit" of trouble breathing. Abigail

remembered defendant telling her that she needed to listen to him, but testified that her attempted response "wasn't clear because he was squeezing [her] cheeks."

Beth gave a similar account of the events on the couch. She testified that she and Paquette had followed defendant and Abigail into the living room of the house, and that she heard defendant repeatedly tell Abigail that he was "the boss," that he "runs the show here[,]" and that the girls needed to listen to him. Beth testified that she watched Abigail try unsuccessfully to get up off the couch at first, and that she did not see Abigail kick or spit at defendant at any time. Beth saw defendant put his knee on Abigail's stomach and push, as well as squeeze her cheeks and place his hand on her throat. Beth stood a "cushion" distance away from defendant at the couch and yelled at him to get off Abigail when she saw Abigail "change color in her face[.]" Beth recalled that defendant had his hand on Abigail's throat for a minute but squeezed for only about five seconds, and that, during that time, Abigail's face turned from pink to "a deeper red." Beth continued to yell at defendant to stop, and tried to take defendant's hand off Abigail's neck. The defendant eventually let go of Abigail's cheeks and neck, stood up, and left the room.

Beth testified that, immediately after defendant let go, Abigail coughed and tried to catch her breath. Beth took Abigail upstairs into the bedroom they shared at their father's house and called their mother. Beth proceeded to take pictures of Abigail on her cell phone, following her mother's instructions. Those pictures were introduced into evidence at trial. Beth then brought Abigail outside to wait for their mother to pick them up from the house. Both Abigail and Beth recalled being taken to their "Aunt Sara's" house immediately after the incident, and then to the police station later that day. Abigail testified that her mother brought her to the hospital the following day to be examined, and that she returned home later that day.

**2**

**Danielle**

Danielle testified that she dropped her daughters off at their father's house on the morning of August 20, 2012, intending to pick them up after she got out of work at noon. At 11:50 a.m., Danielle received a phone call from Beth, who told her about the incident with defendant. Danielle raced to pick the girls up from the house; she saw them sitting outside when she arrived, about fifteen minutes after Beth's phone call. She then drove the girls to her friend's house, about a minute away from defendant's house. Once at her friend's house, Danielle noticed a moon-shaped mark on the right side of Abigail's cheek. She called the girls' and defendant's father to discuss how to deal with the incident; however, the two were not in agreement as to how to proceed. After a couple hours at her friend's house, Danielle took the girls to the Woonsocket police station, where Abigail, Beth, and Danielle were interviewed and gave statements. Later that night, after some thought, Danielle decided to file a complaint against defendant. The following day, Danielle took Abigail to Hasbro Children's Hospital after she complained of cheek pain. Danielle testified that Abigail was examined and that they stayed at Hasbro for a couple hours before Abigail was discharged. Danielle recalled that after returning from the hospital, police officers arrived at her friend's house to take photographs of Abigail. Those photographs were also introduced into evidence at trial.

**3**

**Dana Kaplan, M.D.**

The state called Dr. Dana Kaplan, a child-abuse pediatrics fellow at Hasbro Children's Hospital, to interpret the medical records admitted by stipulation as a full exhibit at trial. Doctor Kaplan testified that she was a licensed physician in Rhode Island and New York, and that,

through that work, she reviewed medical documentation and reports on a daily basis. She confirmed during her testimony that she was not Abigail's treating physician, but that she had reviewed Abigail's medical records at the state's request. Doctor Kaplan testified that the medical records indicated that Abigail's "chief complaint was an attempted strangulation."

When the prosecutor asked about strangulation, Dr. Kaplan explained: "[S]trangulation is part of an umbrella term asphyxia, lack of oxygen. You can provide lack of oxygen through strangulation and through suffocation. Strangulation is when you apply external forces to the neck to close down the vein and artery." She expounded that strangulation by force would result in the impairment of a bodily function—namely, "[d]elivery of oxygen to the brain." Doctor Kaplan was also shown the photographs of Abigail that Beth had taken on her phone following the incident, and she testified that those photographs were consistent with Abigail's medical records. Lastly, Dr. Kaplan testified that she did not find it uncommon that Abigail would be discharged from the hospital after a couple hours or that no further tests would be performed.

**4**

**Patrick Cahill**

The defendant in his testimony described a different version of the events of August 20, 2012. At the time of the incident, defendant was twenty-three years old and working as a Woonsocket police officer. He testified that, on that day, he went upstairs to greet Abigail and Beth when he heard movement in the house. The defendant confirmed that, at some point after he had gone back downstairs to his bedroom, Abigail and Beth came down to watch television and watch him exercise. After a few minutes in his room, defendant recalled that Abigail began "tearing [his] things up" by throwing his clothes on the floor and dumping out his jar of loose coins. The defendant testified that both Abigail and Beth also knocked down travel souvenirs

that he kept on the top of his bureau. The defendant then told the girls that they "had to go upstairs * * * if they [were] going to tear everything apart * * *." The defendant testified that he grabbed Abigail by the arm and walked her upstairs; Beth also walked upstairs. He recalled that Abigail said to him, "[Y]ou can't touch me" as he walked her up the stairs. Abigail returned downstairs within a minute and repeated this behavior two more times, and defendant brought her upstairs each time. On one of the two trips back upstairs, defendant testified, Abigail "dropped dead weight" as he moved toward her, so he picked her up with one hand behind her back and one behind her legs to carry her upstairs.

After the third time he brought Abigail upstairs, defendant testified Abigail and Beth yelled down to him to come up the stairs; defendant began up the stairs, at which point he saw a substance, either salad dressing or mustard, placed "on the stairs so that [he] would slip." The defendant again told both girls to "stop, knock it off, stop, go outside, play, go sit down, watch TV, [and] quit tearing up the house." The defendant returned to his bedroom, and, a couple of minutes later, Abigail returned to defendant's room and told him that she was going to the "Dollar Store," which was about a quarter of a mile from defendant's house. The defendant told Abigail that he would not take her to the store, and he followed Abigail when she ran up the stairs and out of the house. The defendant testified that, when he observed Abigail ask Paquette to take her to the store, he told Paquette that he would not take the girls because "they were not listening."

The defendant testified that, after the exchange between defendant and Paquette, Abigail walked out into the middle of the street. When defendant told her to get on the sidewalk, Abigail taunted him with a "hip shake," telling him, "I don't have to listen to you." The defendant recalled that Abigail was "playing this game to try to get away from [him]" and that his concern

was to get her out of the street. When defendant caught up to Abigail, he grabbed her by "something"—he was not sure what he grabbed—before Abigail dropped to the ground, dead weight, as she had in the basement. The defendant said that he "scoop[ed] [Abigail] up," with his hands underneath her arms, waist, and chest, to get her out of the street. Once defendant walked Abigail to the sidewalk, she put her feet underneath her, and he took her by the arm to walk her into the house. The defendant recalled that Abigail began "headbutting" him in the chest and kicking backwards as he walked her from the sidewalk into the house. The defendant testified that he placed his hand on the back of Abigail's neck to prevent her from continuing to "headbutt" him. Throughout his testimony, defendant emphasized that he was not mad or upset, but that he was annoyed and aggravated at Abigail's behavior.

The defendant testified that, once inside the house, he brought Abigail to the couch, and when he sat her down, she immediately stood up and took a step toward the entrance of the house. The defendant then grabbed Abigail by the shoulder and upper arms to sit her down again, and she began to spit at him and kick him. The defendant testified that he covered Abigail's mouth with his hand and placed his knee on her thigh to prevent her from spitting and kicking. The defendant further testified that his other hand was on the side of the couch, supporting his weight, and was not on Abigail's throat at any time. When he was satisfied that she was going to stay, defendant let go of Abigail. According to defendant, the entire encounter on the couch lasted only about fifteen seconds. The defendant never saw Abigail have trouble breathing, instead commenting that "[s]he was talking and yelling the whole time." He also testified that Abigail was hyperventilating because she had been crying.

**5**

**Amanda Paquette**

During her testimony, Amanda Paquette recalled having a conversation with Abigail outside on the sidewalk about going to the "Dollar Store." Paquette testified that defendant told her from the stairs of the house that they are not going to the store, and that she then watched Abigail and defendant run around her car before defendant walked Abigail into the house by the arm. Paquette had herself walked into the kitchen of the house, and she observed as defendant led Abigail into the living room. Paquette testified that Abigail was screaming, kicking, and spitting, but that she did not have any concern about defendant's interaction with Abigail because he "seemed completely in control of himself." Paquette could see defendant "put" Abigail on the couch, but could not see if defendant placed his hands on Abigail's face or throat. Similar to defendant's testimony, Paquette stated that the incident on the couch lasted about ten to fifteen seconds.

**B**

**Trial Justice's Decision**

On October 9, 2014, the trial justice issued a bench decision. He found Abigail and Beth to be "surprisingly mature and articulate" given "their age and education[.]" Moreover, the trial justice found that there was "no attempt on their part to cover or embellish any fact or circumstance they testified to[,]" and that "[t]hey exhibited no signs of being coached, coerced or rehearsed to testify as they did." The trial justice found Beth's testimony to be "particularly powerful," and that it had "a ring of truthfulness to it." He further found the testimony by Danielle and Dr. Kaplan to be credible. The trial justice also found Dr. Kaplan's testimony to be "particularly relevant to the physical injury requirement of the offense charged." On the other

hand, the trial justice found that the version of events described by defendant and Paquette was "neat, somewhat contrived and carefully scripted."

The trial justice concluded that "any physical injury that falls below the definition of serious bodily injury and is not an injury resulting from non[-]excessive or appropriate corporal punishment may be found to be a physical injury as contemplated by the language related to second degree child abuse" in violation of § 11-9-5.3(b)(2).[3] He found that defendant had "voluntarily asserted himself as an authority figure over [Abigail] and was acting in loco parentis during the events involving him and [Abigail] on the morning in question." Further, the trial justice found that the physical injury element had been met, and that the injury was not the result of non-excessive corporal punishment. Ultimately, the trial justice found that the evidence at trial established, beyond a reasonable doubt, that defendant was guilty of second-degree child abuse, in violation of § 11-9-5.3(b)(2).

---

[3] General Laws 1956 § 11-9-5.3 reads, in relevant part:

> "(b) Whenever a person having care of a child, as defined by § 40-11-2(2), whether assumed voluntarily or because of a legal obligation, including any instance where a child has been placed by his or her parents, caretaker, or licensed governmental child placement agency for care or treatment, knowingly or intentionally:
> "(1) Inflicts upon a child serious bodily injury, shall be guilty of first degree child abuse.
> "(2) Inflicts upon a child any other physical injury, shall be guilty of second degree child abuse.
> "* * *
> "(d) For the purpose of this section, 'other physical injury' is defined as any injury, other than a serious bodily injury, which arises other than from the imposition of nonexcessive corporal punishment.
> "(e) * * * Any person who is convicted of second degree child abuse shall be imprisoned for not more than ten (10) years, nor less than five (5) years and fined not more than five thousand dollars ($5,000)."

## C

## Motion for a New Trial

On October 17, 2014, defendant filed a motion for a new trial, asking the trial justice to vacate the judgment of conviction. The defendant argued that the trial justice had overlooked and misconceived relevant material evidence or was otherwise clearly wrong in his consideration of the facts of the case, given the evidence presented. He asserted that: (1) the trial justice impermissibly allowed the testimony of Dr. Kaplan; (2) the trial justice overlooked the inconsistencies in the testimony by Abigail and Beth; (3) the physical manifestations of the events did not rise to the level of "physical injury"; and (4) the trial justice misconceived material evidence in finding that defendant's actions constituted excessive corporal punishment. At the commencement of the hearing on the motion, the trial justice noted that the motion would be treated as a motion to vacate the judgment of conviction, pursuant to *State v. Dunn*, 726 A.2d 1142 (R.I. 1999), and Rule 33 of the Superior Court Rules of Criminal Procedure. At the end of the hearing, the trial justice denied defendant's motion. The defendant later was sentenced to ten years' imprisonment, with six months to serve and the remaining suspended, with probation. The judgment of conviction was entered on April 20, 2016; defendant timely appealed.[4]

## II

## Issues on Appeal

The defendant raises three issues for our consideration. First, he argues that the trial justice erred in admitting the testimony of Dr. Kaplan; according to defendant, the doctor

---

[4] The defendant filed a premature notice of appeal on December 19, 2014, and that appeal was docketed as No. 2015-86-C.A. The case was remanded to the Superior Court for entry of judgment on defendant's request. Following entry of judgment, in an abundance of caution, defendant filed a second notice of appeal on May 9, 2016, and that appeal was docketed as No. 2016-138-C.A. These appeals have been consolidated.

provided opinion testimony without having been called as an expert witness and her testimony was cumulative and impermissibly bolstered the medical records in evidence. Next, defendant contends that the trial justice erroneously failed to consider simple assault as a lesser-included offense of second-degree child abuse. Last, defendant argues that the trial justice erred in denying his motion for a new trial.

## A

### Admissibility of Dr. Kaplan's Testimony

The defendant first argues that the trial justice erred by allowing Dr. Kaplan to provide expert opinion testimony when she was not tendered as an expert witness. He asserts that Dr. Kaplan's testimony violated Rule 16 of the Superior Court Rules of Criminal Procedure,[5] which requires advance notice of expert testimony. The defendant also argues that Dr. Kaplan's testimony was cumulative and impermissibly bolstered the medical records that were in evidence in the case.

---

[5] "Rule 16 [of the Superior Court Rules of Criminal Procedure] governs discovery procedures in criminal trials." *State v. Santiago*, 81 A.3d 1136, 1140 (R.I. 2014). Rule 16(a) reads, in relevant part:

> "Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State:
>
> "* * *
>
> "(6) A written summary of testimony that the State intends to use under Rules 702, 703, or 705 of the Rhode Island Rules of Evidence during its case-in-chief at trial, which testimony describes the witness' opinions, the bases and reasons for those opinions, and the witness' qualifications[.]"

**1**

**Standard of Review**

"It is well established that decisions concerning the admissibility of evidence are within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." *State v. Alves*, 183 A.3d 539, 542 (R.I. 2018) (quoting *State v. Adams*, 161 A.3d 1182, 1194 (R.I. 2017)). Furthermore, "[t]he trial justice will not have abused his or her discretion as long as some grounds supporting his or her decision appear in the record." *Id.* (quoting *Adams*, 161 A.3d at 1194). Moreover, this Court will not disturb a trial justice's evidentiary ruling absent a finding that the abuse of discretion resulted in prejudicial error. *State v. Ceppi*, 91 A.3d 320, 331 (R.I. 2014).

**2**

**Discussion**

The defendant admits that he did not specifically reference Rule 16 during the trial or in his post-trial motion, but he argues that "the parties and the [c]ourt were clearly discussing and referencing the obligation of the prosecution to provide advance notice of proposed expert testimony." The state counters that, because the trial justice never specifically ruled on a Rule 16 violation, there is no ruling for this Court to review, and, thus, the issue has been waived.

It is well settled that the raise-or-waive rule "precludes us from considering at the appellate level issues not properly presented before the trial court." *State v. Yon*, 161 A.3d 1118, 1128 (R.I. 2017) (quoting *State v. Merida*, 960 A.2d 228, 236 (R.I. 2008)). "The raise-or-waive rule 'imposes upon litigants a duty to raise all their claims for relief in the trial court and properly articulate them to a judge for a ruling.'" *Id.* (quoting *D'Alessio v. State*, 101 A.3d 1270, 1278 (R.I. 2014)). In the context of Rule 16 violations, we have held that a party must "adequately

express[] its Rule 16-based objection in a manner sufficient to afford the trial justice an opportunity to elicit further information and properly pass on the issue." *State v. Stierhoff*, 879 A.2d 425, 435 (R.I. 2005).

At the start of Dr. Kaplan's testimony, counsel for defendant articulated a preliminary objection for the record, stating that, because the doctor had not been noticed as an expert witness, he feared that her testimony beyond the hospital records had the potential to be cumulative or bolstering. Additionally, the trial justice and the prosecutor engaged in a brief colloquy referencing this discovery issue during Dr. Kaplan's testimony.[6] However, as defendant concedes, neither the parties nor the trial justice mentioned Rule 16 specifically. Moreover, the trial justice did not make any rulings with respect to a discovery violation at any point during trial. The defendant argues before this Court that, nonetheless, there has been no waiver of the issue on appeal because "everyone involved in the case was cognizant" of the Rule 16 violation. This general awareness and the brief colloquy, however, are insufficient to preserve the issue for appeal. It is clear that defendant did not "adequately express[] [his] Rule 16-based objection in a manner sufficient to afford the trial justice an opportunity to elicit further

---

[6] The colloquy between the trial justice and the prosecutor proceeded as follows:

> "THE COURT: Here is the thing, it is a very, I think difficult line you are trying to walk with this witness and I'm not -- I don't mean that in a critical way but I think it is a hard examination because she is neither the treating doctor nor an expert. She is kind of an in between. I'm not sure how to characterize her, but…
>
> "[THE STATE]: You can make her an expert but I'm sure [defense counsel] will have a problem with that.
>
> "THE COURT: She wasn't noticed."

information and properly pass on the issue." *Stierhoff*, 879 A.2d at 435. Thus, this issue has been waived.

Nevertheless, the record demonstrates that defendant made particular evidentiary objections to Dr. Kaplan's testimony at several points throughout the trial, arguing that the testimony was cumulative, impermissibly bolstered the medical records, and improperly crossed into expert-testimony territory. Evidence is considered to be cumulative if it "tends to prove the same point to which other evidence has been offered." *Ceppi*, 91 A.3d at 332 (quoting *State v. Lomba*, 37 A.3d 615, 622 n.7 (R.I. 2012)). The test for determining whether evidence is cumulative "is a retrospective one, administered at the close of all the evidence to determine whether the admission of certain evidence was harmless in light of all the evidence admitted on that point." *State v. Robinson*, 989 A.2d 965, 979 (R.I. 2010) (quoting *State v. Lynch*, 854 A.2d 1022, 1032 (R.I. 2004)). "Impermissible bolstering occurs typically 'when one witness offers an opinion concerning the truthfulness of the testimony of another witness.'" *Ceppi*, 91 A.3d at 332 (quoting *State v. Hazard*, 797 A.2d 448, 470 (R.I. 2002)). Further, "[w]hen this Court determines that specific testimony constitutes impermissible bolstering, our task is then to determine whether the trial justice's decision to admit such improper testimony constituted prejudicial error." *State v. Rushlow*, 32 A.3d 892, 899 (R.I. 2011).

In a jury-waived case, cumulative or bolstering evidence does not have the same prejudicial impact as it would in a jury trial. *Ceppi*, 91 A.3d at 332 (holding that any prejudice resulting from an evidentiary error would be "substantially diminished" in a jury-waived trial (quoting *State v. Medeiros*, 996 A.2d 115, 121 (R.I. 2010))); *State v. Notarantonio*, 622 A.2d 457, 459 (R.I. 1993) ("Most of our rules of evidence relating to * * * bolstering of the credibility of the witness are designed to protect jurors from being misled by testimony that may be

improperly assessed by untrained lay persons."). In the case at bar, the trial justice acknowledged the potential "danger" of cumulative testimony in jury trials, but commented that he would "guard against that as a fact finder"; he specifically assured the parties that he "w[ould] not be prone to give it more weight as [he] heard it more than once." To the extent that Dr. Kaplan's testimony was cumulative, therefore, we are satisfied that it was not prejudicial to defendant.

Moreover, we are of the opinion that defendant's challenge to Dr. Kaplan's testimony as bolstering is somewhat of a misnomer. The medical records were admitted into evidence by stipulation of the parties; the truth and accuracy of their contents were not in question. Furthermore, the portions of Dr. Kaplan's testimony to which defendant objected were, at best, harmless in this jury-waived trial. Although the trial justice did state that he found Dr. Kaplan's testimony to be "credible and particularly relevant to the physical injury requirement of the offense charged[,]" he clearly relied upon his own expertise as an experienced trial justice:

> "The dictionary definition of the word injury is harm or damage from trauma. In this case, the evidence establishes and this Court finds that defendant's grasping and pulling the ponytail of a nine[-]year-old child weighing 66 pounds for a distance of approximately 30 feet, placing his knee on her stomach while lying on a couch, placing one hand on her cheeks and the other on her neck and applying pressure to the cheeks and neck for a period sufficient to temporarily impair a bodily function, in this case breathing, satisfies this Court beyond a reasonable doubt that the defendant inflicted a physical injury on [Abigail]."

By allowing Dr. Kaplan to render a medical definition of "strangulation[,]" the trial justice permitted her to exceed the appropriate boundaries of a fact witness and enter the realm of expert testimony. We reject, however, any notion that the trial justice, sitting as he was, without a jury, required such an expert explication in light of the facts of this case. "Strangulation" is a term well-known to a seasoned trial justice in the context of a criminal trial.

The defendant also objected at trial to Dr. Kaplan's testimony that the photographs of Abigail were consistent with the history provided in the medical records. In overruling defendant's objection, the trial justice noted, "I think all she is saying at least from this person's view who is the fact finder is she is saying that those photographs are consistent with the term strangulation that was used in the medical record. I think that is all she can say." The photographs in question were those taken of Abigail by Beth immediately after the incident with defendant. We are hard-pressed to categorize Dr. Kaplan's testimony in this regard as an expert opinion. The photographs were admitted by stipulation as full exhibits; the trial justice was certainly capable of comparing them to the medical history. We perceive no error.

Finally, defendant objected at trial to Dr. Kaplan's testimony that she did not think it was uncommon that Abigail was discharged from the emergency room a couple hours after initially presenting herself there. The trial justice, however, did not refer to this information in his decision and appeared to give it little, if any, weight. To the extent that Dr. Kaplan's testimony in this regard may have been improperly admitted, it is beyond question harmless.

In sum, we are of the opinion that Dr. Kaplan's testimony provides no basis for vacating defendant's conviction.

**B**

**Lesser-Included Offense**

The defendant next challenges the trial justice's determination that second-degree child abuse does not include any lesser-included offenses. He contends that, as a matter of law, simple assault is a lesser-included offense of the crime of second-degree child abuse, as set forth in § 11-9-5.3(b)(2) and (d), in cases where there has been no evidence of injury, or evidence of only a *de minimis* injury.

- 17 -

## 1

## Standard of Review

It is well settled that, "[i]n a jury-waived criminal proceeding, this Court gives deference to a trial justice's finding[s] of facts." *Medeiros*, 996 A.2d at 121 (second alteration in original) (quoting *State v. Adewumi*, 966 A.2d 1217, 1221-22 (R.I. 2009)).  Those findings will not be disturbed "unless they are clearly wrong or unless the trial justice has overlooked or misconceived relevant and material evidence." *State v. DiPetrillo*, 922 A.2d 124, 130 (R.I. 2007) (quoting *Barone v. Cotroneo*, 711 A.2d 648, 649 (R.I. 1998) (mem.)).  Questions of law are reviewed *de novo*. *State v. Oliveira*, 961 A.2d 299, 308 (R.I. 2008).

## 2

## Discussion

The defendant argues that without Dr. Kaplan's testimony, the trial justice may not have found the physical injury element of the charge to have been met, and therefore could have found defendant guilty of a lesser-included offense of simple assault.  Although defendant concedes that he failed, at trial, to request a ruling of law in accordance with G.L. 1956 § 12-17-3 and Rule 23(c) of the Superior Court Rules of Criminal Procedure, he maintains that this issue has been preserved for our consideration on appeal, arguing that the record clearly allowed for the trial justice to consider simple assault as a lesser-included offense.[7]  The defendant contends that, as a matter of law, "excessive corporal punishment that results in no injury or de minimis injury is simple assault and battery, as defined by [G.L. 1956 §] 11-5-3."

---

[7] Rule 23(c) of the Superior Court Rules of Criminal Procedure provides, in part, that "[i]n a case tried without a jury the court shall make a general finding and shall in addition *on request* find the facts specially and state separately the court's conclusions of law thereon." (Emphasis added.)  Similarly, G.L. 1956 § 12-17-3 provides that, in jury-waived cases, "the court shall, *upon request of the accused*, make special finding upon any issue of fact and special ruling upon any question of law arising in the case." (Emphasis added.)

The state argues that the issue of the trial justice's failure to consider a lesser-included offense has been waived because defendant did not request a ruling of law on this issue, and that, although defendant commented on the applicability of a lesser-included offense in his supplemental memorandum to his closing argument, defendant did not "urge" the trial justice to consider it in this case. Furthermore, the state argues that, even if the issue has not been waived, the trial justice's decision was valid on these facts, based on his findings that the "other physical injury" and "excessive" force requirements had been met.

A review of the record reveals that the trial justice provided commentary regarding his reading of the statute at several points throughout the trial proceedings.[8] Most notably, he remarked on the statute's construction during defendant's closing argument, opining that "[i]t is a very unique statute the way it was drafted[,]" and further observing, "I don't see any -- there is no lesser[-]included offense of any kind." The state was the first party to raise the argument that simple assault was a lesser-included offense of the crime of second-degree child abuse during its

_____

[8] For example, during the hearing on defendant's motion to dismiss following the state's case, the trial justice inquired:

| "THE COURT: | Is second degree [child abuse] anything else unless it falls within corporal punishment[?] |
| "[DEFENSE COUNSEL]: | Yes, your Honor. |
| "THE COURT: | Anything else that -- |
| "[DEFENSE COUNSEL]: | Physical injury. |
| "THE COURT: | -- that can be a physical injury. That is a broad category." |

The colloquy continued:

| "THE COURT: | And I don't want to use that word assault because they don't use words like that in the statute. |
| "[DEFENSE COUNSEL]: | No, they don't." |

closing statement, but maintained that the trial justice did not need to reach that question on the facts of this case. The defendant did not challenge the trial justice's discussion during the trial or at closing argument; indeed, he first raised this contention in his supplemental memorandum to his closing argument.[9]

We are satisfied that the trial justice clearly articulated a basis for his finding that the injury requirement of the second-degree child abuse statute had been met, relying on credible witness testimony from Abigail, Beth, and Danielle, in addition to the medical records and photographs of Abigail's injury. Because the trial justice determined that the elements of the second-degree child abuse statute had been met, he did not need to reach the question of a lesser-included offense. Accordingly, we need not address the issue at this time.

---

[9] The final paragraph of defendant's ten-page "Supplement to Defendant's Oral Closing Argument" reads, in part, as follows:

> "A lesser included offense is one that does not require proof of any additional elements beyond those required by the greater offense. *State v. Briggs*, 787 A.2d 479 ([R.I.] 2001). *In this instance, Defendant respectfully suggests that the charge of simple assault is a lesser included offense of second degree child abuse*. In the case of *State v. Cardona*, 969 A.2d 667 ([R.I.] 2009), the Court recognizes that the charge of simple assault, pursuant to R.I.G.L. §[ ]11-5-3, encompasses both assault and battery. In that case, the term 'battery' is defined as an act that was intended to cause, and does cause, an offensive contact with or unconsented touching of or trauma upon the body of another, thereby resulting in the culmination of the assault. In this instance, the greater offense, second degree child abuse, does clearly involve an offense [*sic*] contact with or unconsented of or trauma upon the body of another. However, the elements of second degree child abuse do not require either physical injury or excessive corporal punishment." (Emphasis added.)

# C

## Post-Trial Motion

The defendant argues that the trial justice erred in denying his motion for a new trial, based on his two main arguments on appeal: (1) that the trial justice impermissibly allowed expert testimony from Dr. Kaplan; and (2) that the trial justice erroneously failed to consider simple assault as a lesser-included offense of second-degree child abuse.

As the trial justice recognized at the outset of the hearing on defendant's motion for a new trial, Rule 33 "does not authorize a trial justice following a jury-waived criminal trial to grant a new trial." *Dunn*, 726 A.2d at 1146. Rather, "Rule 33 permits only that a trial justice on motion by the defendant 'may vacate the judgment * * * take additional testimony and direct the entry of a new judgment.'" *Id.* (quoting Super. R. Crim. P. 33). "A motion for a new trial in a jury-waived criminal case is of 'limited effectiveness' because it merely 'affords a defendant an opportunity to convince the trial justice that he or she was wrong in his or her factual findings.'" *DiPetrillo*, 922 A.2d at 130-31 (quoting *State v. Champagne*, 668 A.2d 311, 313 (R.I. 1995)). In ruling on such a motion, the trial justice "may only proceed to act upon and consider the reasons for vacating judgment that are properly advanced in the new trial motion." *Dunn*, 726 A.2d at 1146.

Additionally, for review of a Rule 33 motion, this Court "appl[ies] the same deferential standard of review as would be applied to the Superior Court justice's factual findings on the merits." *DiPetrillo*, 922 A.2d at 131. Accordingly, the trial justice's determinations are "entitled to great weight and will not be disturbed unless the trial justice has overlooked or misconceived relevant and material evidence or was otherwise clearly wrong." *Id.* (quoting *Champagne*, 668 A.2d at 313).

After a thorough review of the record in this case, we are of the opinion that the trial justice has not overlooked or misconceived relevant material evidence, and that he was not otherwise clearly wrong when he denied defendant's motion. The trial justice carefully considered the defendant's arguments in support of his motion for a new trial, and reiterated his finding that the physical-injury requirement of the statute had been met on the facts of the case as established by the evidence at trial. The trial justice further stated that he remained convinced that Beth and Abigail were credible witnesses, worthy of belief, while acknowledging some inconsistency in their testimony.[10] It is well settled that a trial justice is afforded great deference in making credibility determinations, and, thus, we will not disturb the trial justice's finding in this regard. *See State v. Van Dongen*, 132 A.3d 1070, 1076 (R.I. 2016). Accordingly, we conclude that trial justice did not err in denying the defendant's post-trial motion.

**III**

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.

---

[10] In fact, the trial justice found that the slight inconsistencies in the trial testimony by Abigail and Beth made the witnesses more credible. The trial justice stated that, if they had been exactly the same, he would have been led to believe that the witnesses may have been coached.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Patrick Cahill. |
| **Case Number** | No. 2015-86-C.A. No. 2016-138-C.A. (P1/12-2771A) |
| **Date Opinion Filed** | November 30, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of the Attorney General |
| | For Defendant:<br><br>Robert B. Mann, Esq. |