May 14, 2020

**Supreme Court**

No. 2019-75-C.A.

(P1/16-1489A)

State                    :

v.                    :

Eric Mensah.          :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State       :

v.         :

Eric Mensah.      :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** On September 25, 2017, Eric Mensah (Mensah or defendant) was found guilty by a jury of two counts of first-degree child molestation sexual assault and two counts of second-degree child molestation sexual assault of his eight-year-old daughter. He appeals from the judgment of conviction, arguing that the trial justice erred by admitting evidence of an uncharged incident under Rule 404(b) of the Rhode Island Rules of Evidence and by denying his motion for a new trial. For the reasons set forth herein, we affirm the judgment of the Superior Court.

### I

### Facts and Procedural History

Emma[1] moved to Rhode Island from Ghana during the summer of 2014, when she was eight years old. When she came to Rhode Island, she moved in with defendant, her father, into his second-floor apartment in Pawtucket in a home owned by defendant's sister, Ama. In December 2015, Emma disclosed to her babysitter, Luz Velez (Velez) that defendant had sexually assaulted her shortly after she arrived from Ghana. As a result of this disclosure and the subsequent

---

[1] Because the complainant in this case is a minor, we employ our customary practice of identifying her by use of a pseudonym.

investigation, defendant was indicted on May 6, 2016, on two counts of first-degree child molestation sexual assault, in violation of G.L. 1956 § 11-37-8.1, and two counts of second-degree child molestation sexual assault, in violation of § 11-37-8.3. The defendant pled not guilty to the charges on June 8, 2016.

## A

## The State's Motion *In Limine*

Prior to trial, the state filed a motion *in limine* seeking to admit evidence of other alleged sexual contact between defendant and Emma; instances of defendant asking Emma about her "breasts and pubic hair"; and other nonsexual physical abuse, specifically, defendant hitting Emma with a hanger and an incident on July 23, 2015, in which police were called to defendant's apartment. The state contended that these incidents were admissible under Rule 404(b) because they "explain[ed] why [Emma] was afraid to disclose the sexual abuse" by defendant, "why the sexual abuse suddenly stopped[,]" and why Emma feared that police would not believe her if she reported the abuse.

The defendant argued that the incident on July 23, 2015, was inadmissible because the alleged acts that occurred on that day were not similar to the charges against defendant in that "[t]he conduct sought to be admitted [was] not sexual in nature[.]" The defendant argued that "a parent disciplining [his or her] child for whatever reason" had "no relevance whatsoever" to a sexual assault charge, was "extremely prejudicial[,]" and would only serve to confuse the jury. Concerning the other evidence of alleged sexual abuse, defendant contended that the evidence should not be admitted because it was uncharged, prejudicial evidence.

The trial justice indicated that she would allow evidence of the July 23 incident; however, she excluded evidence that defendant's pants were unbuttoned and that he was shirtless when he

answered the door for police because it might cause the jury to believe that he had perhaps sexually assaulted Emma on that occasion. She also allowed evidence that defendant hit Emma with a hanger because it explained Emma's fear of defendant and the delay in disclosure of the abuse at issue in this case. Stating that "[e]vidence that an accused committed non-remote similar sexual offenses with * * * [the] complaining witness[] * * * may be admitted," the trial justice also said that she would allow evidence of other alleged uncharged sexual contact because the "evidence would tend to demonstrate [a] lewd disposition toward [Emma], intent, plan, opportunity, [or] design."

The trial began on September 14, 2017.

**B**

**The State's Case**

Emma testified that in the summer of 2014, shortly after she arrived from Ghana, she and defendant went inside the apartment and took a nap together after coming home from Armando's, a meat store. As they were lying on the bed, defendant removed the blanket that was covering Emma, took off her clothes, and turned her over. Emma testified that defendant's penis touched the inside of her "butt" as his body moved "up and down." She also testified that his finger went "[i]n [her] vagina." The assault lasted twenty to thirty minutes and ended when Emma told defendant that if he did not stop, she would call the police. The defendant told Emma not to tell anyone and that the next day he would take her to Chuck E. Cheese. According to Emma, they then left the apartment to go to the house of Emma's aunt. Emma stayed with her aunt that night but did not tell her what had occurred earlier that day because she was scared and because defendant had promised to take her to Chuck E. Cheese. Moreover, defendant threatened her with

being sent back to Ghana if she reported what had happened in the apartment, an outcome that Emma did not want. Ultimately, Emma did not report this incident until December 2015.

Emma also testified to the incident that occurred about a year later, on July 23, 2015. She testified that she lost an earring, and defendant told her if she did not find it, she would not be allowed to go on a field trip the next day as part of summer camp. She eventually found the earring, but defendant nevertheless beat her with a hanger. Police came to the apartment, and defendant told Emma to get in the shower, which she did. Emma testified that she told the police she was fine and that she chose to lie to police because, if she told the truth, defendant would have beaten her.

When the July incident occurred, Timothy Orr was living on the third floor of defendant's apartment building, above defendant. Orr testified that when he was leaving the building around 10 p.m. on July 23, 2015, he passed by the door to defendant's apartment and heard what sounded like Emma "being gagged aggressively," being "chased around," and yelling, "Why, Daddy. Why." Orr knocked on the door out of concern, and, because there was no response, he called 911.[2]

Detective Kerry Hormanski of the Pawtucket Police Department also testified. She and her partner responded to defendant's residence after Orr's 911 call. When they arrived, the first-floor tenant, a woman, let Det. Hormanski and her partner into the apartment building and told police that she had also heard what sounded like someone gagging. Detective Hormanski, however, did not recall hearing anything from defendant's apartment while walking up the stairs or while on the landing. The police knocked on defendant's door, and defendant told them to "give him a few minutes." The detective then "heard water turn on" from a bath or a shower, and they

---

[2] A recording of the 911 call was played for the jury.

knocked a second time, and defendant again told them to "just give him a few minutes." The defendant then came to the door, and they informed him that they were there to investigate a call.

Detective Hormanski testified that she asked for permission to check on Emma, which defendant gave even though Emma was in the shower. Detective Hormanski checked on Emma and noticed that the bathroom door was already open, and there was a clear shower curtain. She observed that Emma was in the shower with the water running, wearing a shower cap and her underwear. The detective testified that she asked Emma about her underwear, and Emma said she was going to take them off shortly. The detective spoke with Emma again after she got out of the shower and noticed that it appeared Emma had been crying, although the detective did not note any bruising on Emma's face. Emma told the detective that everything was fine, but she was unable to maintain eye contact during that portion of the conversation. The detective testified that "[t]here was no real way to separate" Emma and defendant while she spoke to Emma because of the small size of the apartment.

Detective Hormanski testified about other details from her visit to defendant's apartment that concerned her. Specifically, she noticed the apartment was "in disarray" with ants crawling on food and only one bedroom for an apartment with two people living in it, although defendant told the detective that he slept in the living room, and Emma slept in the bedroom. Additionally, the detective described defendant's demeanor as "hostile." These concerns, among others, led Det. Hormanski to call the Department of Children, Youth and Families after leaving the apartment.

Emma testified to other incidents involving defendant as well. She testified that when she moved in with defendant, she slept with him in the same bed, and defendant watched pornography in bed with her. At other times, defendant put music on while he was cooking, touching Emma's breasts and buttocks as they danced. Additionally, she testified that defendant had commented to

- 5 -

her about her pubic hair, hit her buttocks with a hanger, and hit her buttocks, face, and thighs with his hand. She testified that she had told her Aunt Ama "about the hitting" and showed her the bruises but did not disclose the sexual abuse.

Emma testified that on the day she first disclosed defendant's sexually assaultive conduct towards her, she went to Velez's apartment around 3 p.m. to watch a television show, *viz.*, *Forensic Files*. The episode was about a rape and murder, and Emma told Velez she was feeling sad when she watched it because she was thinking about what had happened to her. Emma testified that, upon being asked by Velez about how she was feeling, she told her what had happened. The next day, Velez reported what Emma had told her to personnel at Emma's school. Emma then told her story to the principal, a social worker at her school, a doctor, and DCYF. Emma testified that she told the doctor that defendant had stopped touching her about five to six months earlier.

Velez testified that she babysat Emma frequently in Velez's first-floor apartment. On a day in December 2015, Emma visited Velez, and they watched *Forensic Files*.[3] Velez noticed that Emma became sad during the show, and Velez asked her what was wrong. Emma began to cry and, after some prompting by Velez to tell her what was wrong, she told Velez that defendant had been hurting her and touching her, penetrated her anally one time, made her watch pornography, touched her breasts and private areas, commented on her pubic hair, and hit her. She also told Velez about her father's promise to take her to Chuck E. Cheese if she did not say anything about the assault and that she slept in the same bed with defendant.

---

[3] Velez told Detective Charles Devine during the police investigation that the *Forensic Files* episode was about a girl being raped by her father. Lisa Kolek, a child protective investigator with DCYF, testified that a few days after she took Emma to the Aubin Center at Hasbro Children's Hospital, Velez told her that the television show had been about a father molesting his daughter.

Velez testified that Emma did not want Velez to call the police because Emma was worried the police would not believe her after she had told them she was fine just a few months earlier. If the police did not believe her, she would have to stay in the apartment with defendant, and she was afraid he would hurt her. Emma told Velez that the last time the police came, defendant told her, in their native language, that he would kill her if she said anything.[4] Because of Emma's concerns regarding the police, Velez went to Emma's school to speak with a guidance counselor the next day. Velez also testified that she had observed defendant slap Emma a few times on the face, back, and buttocks, and about one time in particular that the slap was hard enough to make Emma fall.

Lisa Kolek, a child protective investigator with DCYF, testified that a call came into the DCYF hotline on July 24, 2015, from Det. Hormanski. Kolek testified that Det. Hormanski relayed the details of Det. Hormanski's visit to the home. DCYF did not send an investigator out because Emma had not disclosed abuse or neglect at that time. Months later, on December 21, 2015, a second call came into the hotline about Emma from a Baldwin Elementary School (Baldwin) social worker. This time, Kolek went to Baldwin, and, at Baldwin, she was told that Emma's babysitter (Velez) "had come to the school with concerns[.]"

Kolek further testified that Emma was called to the school office to speak with Kolek, and Emma reported to Kolek that defendant had anally penetrated her with his penis one time and routinely touched her breasts, vagina, and buttocks, but that had not occurred in about six months. Kolek testified that Emma reported to her that defendant told her not to tell anyone about the assault and that if she did not tell, he would take her to Chuck E. Cheese. She further reported that defendant was hitting her daily with his hands and a cut rubber hanger. Emma told Kolek that she

---

[4] Detective Hormanski testified that she did not recall hearing defendant and Emma converse in a foreign language while she was there.

had been watching a *Forensic Files* episode with Velez about a woman who was raped and murdered, which led Emma to disclose the abuse at that time. Kolek took Emma from Baldwin to the Aubin Child Protection Center at Hasbro Children's Hospital[5] (Aubin Center), where she was examined, and then to her Aunt Fostina's home after the exam, where she stayed for several months.

Rachel Cohen, M.D., who is a pediatric fellow at the Aubin Center, treated Emma on December 21, 2015, when Emma was ten years old. Doctor Cohen testified that, at the time of Emma's examination, Emma had not had a forensic interview with Day One;[6] therefore, Dr. Cohen took a medical history from both Emma and Kolek. Doctor Cohen testified that Emma told her that defendant had "put his thing in her butt" one time, and that he had touched her breasts, vagina, and buttocks on more than one occasion. Emma reported that she had anal pain after penetration but was not in pain at the time of the examination, and she further reported to Dr. Cohen that the sexual contact had stopped five to six months prior to the examination. Emma further indicated to Dr. Cohen that defendant had hit her with his hands or with a cut rubber hanger almost daily; however, Dr. Cohen did not observe any bruising during her examination of Emma. Doctor Cohen examined Emma's vagina and anus, and there was no evidence of injury, fissures, or scars. However, Dr. Cohen testified that 90 to 95 percent of the time, children who have disclosed sexual abuse have normal examinations, and, furthermore, less than one percent of the time are injuries shown on the anal examinations.

---

[5] The Aubin Center is a department at Hasbro Children's Hospital that consists of pediatricians who evaluate children when abuse or neglect is alleged or suspected.
[6] Day One is a sexual assault treatment and advocacy agency. Its Children's Advocacy Center interviews child victims of molestation and assault using trained interviewers.

Detective Charles Devine testified that he received a call from Day One on December 21, 2015, regarding a case of suspected child molestation. Detective Devine spoke to a doctor at the Aubin Center and was told that Emma reported that defendant anally penetrated her with his penis, digitally penetrated her vagina, and touched her vagina and breasts over her clothes. Detective Devine testified that he ran the names of the individuals involved through the police computer system and found the report on defendant that Det. Hormanski had filed in July of that year. He went to defendant's apartment, arrested defendant, and searched the apartment but did not seize anything that ultimately had any evidentiary value. Detective Devine spoke to Velez the same afternoon he had gone to defendant's home. Velez told him that she babysat Emma and had been watching a television show with her that Det. Devine believed was about a father who molested his daughter.

## C

### The Defendant's Case

The defendant called three individuals to testify on his behalf: his brother, his sister-in-law, and a friend he grew up with in Ghana. Samuel Mensah (Samuel),[7] defendant's brother, testified that he moved to the United States on November 22, 2010. Samuel lived with defendant from June to "late September or early October" of 2015, and, therefore, was not living in the apartment when Emma arrived in 2014. Samuel testified that he lived with defendant for four to five months and never saw defendant watch pornography or hit Emma; he also never observed bruises on Emma. He testified that he was living with defendant when police came to the

---

[7] We refer to defendant's brother by his first name so as to distinguish him from defendant, who has the same last name. We intend no disrespect by doing so.

apartment in July 2015, but was not home at the time and may have been at work when the police arrived at 10 p.m.

Concerning the apartment living situation, Samuel testified that there was one bed in the apartment that Emma slept on by herself, he slept in the living room with a blanket and fold-up mattress that he would put away in the morning, and defendant slept on the couch in the living room. He testified that he never noticed if the shower curtain in the bathroom was transparent, although he took a shower every day. The most he could testify to was that he did not believe the curtain was clear because he could only see a shadow of the person who was in the shower. He also testified that he and defendant used to clean the apartment "very well," and it would not be accurate if someone said there were ants on open food because he only ever saw one or two ants.

Next, Jennifer Patty Ashong, defendant's sister-in-law, testified that Emma did not disclose the abuse to her nor did Ashong ever see defendant hit Emma or see bruises on her. On cross-examination, Ashong admitted that she had never lived with defendant and could not testify about anything that happened in the apartment on July 23, 2015.

Finally, Kwadwo Dakwa, M.D., testified that he grew up with defendant in Ghana and moved to the United States in 1990. Doctor Dakwa testified that, in his culture, Emma "would be perceived as probably [his] grandchild[.]" Emma and Dr. Dakwa had never met in person, but Emma talked to him on the phone about what was going on in her life, such as homework and her after-school activities, and how she was adjusting to the United States. Additionally, Emma wanted to be a physician like Dr. Dakwa, and she talked to him about that career path. He testified that Emma never complained to him about defendant.

At the end of the trial, the jury returned a verdict of guilty on all four counts in the indictment.

# D

## Motion for a New Trial

After the trial, defendant moved for a new trial under Rule 33 of the Superior Court Rules of Criminal Procedure, arguing that the evidence was insufficient to support count one, penile penetration of the anus; and count two, digital penetration of the vagina. The defendant contended that here, as in *In re B.H.*, 138 A.3d 774 (R.I. 2016), the complainant's testimony was insufficient to prove anal penetration. The defendant further contended that the evidence did not support count two because Emma's testimony was "too imprecise and vague" on the issue of whether penetration actually occurred. Before the trial justice, defendant orally argued that the weight of the evidence was insufficient for a conviction, specifically contending that Emma was not a believable witness.

When the trial justice rendered her bench decision on the motion for a new trial, she first articulated the weight of the evidence standard and said that she thought defendant "probably was" guilty, but had she been on the jury, she "would have found that the [s]tate failed to prove the allegations * * * by proof beyond a reasonable doubt." The trial justice noted that Velez's testimony was "a bit inconsistent[,]" and Emma's testimony was "not strong." She then found, however, that reasonable minds could differ with her, particularly because the jurors could have found Emma to be credible and her demeanor on the stand more related to discomfort or embarrassment than to lack of candor. The trial justice then engaged in an exhaustive summary of the evidence that was before the jury, which we need not recount in detail here.

Next, the trial justice addressed the sufficiency of the evidence. The trial justice found that there was sufficient evidence of anal penetration because Emma reported anal pain and that defendant was moving back and forth. These two pieces of evidence were more than the

complainant in *In re B.H.* had testified to, and thus the trial justice found the evidence sufficient. The trial justice did not address the issue of digital penetration of the vagina.

The defendant filed a timely notice of appeal.

## II

## Discussion

On appeal before the Court, Mensah raises two issues: first, that the July 2015 "lost earring" incident should not have been admitted under Rule 404(b); and second, that the trial justice erred by denying his motion for a new trial. We address both issues in turn.

## A

## Rule 404(b) Evidence

Mensah argues that evidence of the July 2015 police encounter, which resulted in neither charges against defendant nor injuries to the child, should not have been admitted at trial. He contends that other witnesses were prepared to testify about Emma's fear of her father and that the state should not have been "allowed to display an official encounter to increase the gravity of its contentions." He argues that the evidence about that encounter simply allowed defendant to be portrayed in a bad light. He also argues that the trial justice erred by admitting this evidence because the incident did not relate to any of the admissible elements set forth in Rule 404(b), nor did the trial justice specify which Rule 404(b) exception pertained to the evidence. The defendant contends that the admission of this evidence violated Rule 404(b) and his Sixth Amendment right to a fair trial. The only remedy, he maintains, is a reversal of his conviction.

Furthermore, defendant contends that the police encounter was an isolated incident, dissimilar to the acts charged, not proximate in time to the charged acts, and not necessary to prove

the crimes charged.  The defendant also argues that the evidence should have been excluded on Rule 403 grounds, a rule that "cuts across the rules of evidence[.]"

The state counters that defendant's argument is waived because he never objected to the evidence during the trial and, alternatively, that the trial justice was within her discretion to admit the evidence because "it was interwoven with the narrative of the charged offenses and rebutted * * * [d]efendant's theory that [Emma's] testimony was incredible."  The defendant responds to the waiver argument by observing that the trial justice's attention must only be "sufficiently focused so as to call [his or her] attention to the basis for said objection."

## 1

## Standard of Review

The Court examines a trial justice's decision to admit Rule 404(b) evidence under an abuse of discretion standard. *State v. Perry*, 182 A.3d 558, 568 (R.I. 2018).  "[T]his Court is disinclined to perceive an abuse of discretion so long as the record contains some grounds for supporting the trial justice's decision." *Id.* (deletion omitted) (quoting *State v. Rainey*, 175 A.3d 1169, 1182 (R.I. 2018)).

## 2

## Analysis

"The raise-or-waive rule imposes upon litigants a duty to raise all their claims for relief in the trial court and properly articulate them to a judge for a ruling." *State v. Andrade*, 209 A.3d 1185, 1194 (R.I. 2019) (quoting *State v. Cahill*, 196 A.3d 744, 753 (R.I. 2018)).  "It is well settled that the raise-or-waive rule precludes us from considering at the appellate level issues not properly presented before the trial court." *Id.* (quoting *Cahill*, 196 A.3d at 753).

Although defendant objected to the state's motion *in limine*, such an objection is not adequate to preserve the issue for appeal. "[T]his Court repeatedly has stated that the grant or denial of a motion *in limine* is by no means a final ruling on the admissibility of the evidence addressed in the motion[,]" *State v. Buchanan*, 81 A.3d 1119, 1126 (R.I. 2014), and such a ruling is "preliminary in nature[.]" *State v. Colon*, 198 A.3d 1249, 1255 (R.I. 2019). "The inherent purpose of a motion *in limine* is to prevent the proponent of potentially prejudicial matter from displaying it to the jury in any manner until the trial court has ruled upon its admissibility in the context of the trial itself." *Id.* (brackets and deletion omitted) (quoting *Buchanan*, 81 A.3d at 1126). Therefore, "an *in limine* ruling is not final[,] and a trial justice is vested with broad discretion to reconsider the ruling as the trial unfolds." *Id.* (quoting *Buchanan*, 81 A.3d at 1126). "Accordingly, it is incumbent upon counsel to raise 'timely and appropriate' evidentiary objections throughout the trial in order to preserve the issues for appeal." *Id.* (quoting *State v. Ciresi*, 45 A.3d 1201, 1212 (R.I. 2012)).

At no time during the Rule 404(b) testimony did defendant raise a timely objection. The most defendant can point to is an off-the-record bench conference after Orr testified on direct examination, after which the trial justice stated, "My previous 404(b) ruling pertains to this testimony."

Although defendant surmises that the trial justice's attention was "sufficiently focused so as to call the trial justice's attention to the basis for said objection[,]" that is not all that is required. We have said that "it is [defendant's] duty to lodge specific objections on the record if he wishes to preserve them for appeal." *State v. Whitaker*, 79 A.3d 795, 814, 815 (R.I. 2013) (also holding that the defendant was not "entitled to a new trial because certain bench conferences were not placed on the record"). Furthermore, even if we give defendant the benefit of the doubt that he

objected to the Rule 404(b) evidence at this untranscribed bench conference, the objection occurred after the conclusion of Orr's direct examination and was therefore untimely. Moreover, defendant made no objection on Rule 404(b) grounds whatsoever to Emma's testimony concerning the July 23, 2015 incident nor to Det. Hormanski's testimony. The defendant's arguments regarding the admissibility of the Rule 404(b) evidence are waived.

**B**

**New Trial**

The defendant next argues that there was insufficient evidence of anal penetration, and thus, his motion for a new trial should have been granted. He further contends that the trial justice's ruling was not a "clear focused assessment of whether the verdict was against the weight of the evidence" because the trial justice did not specifically find that the evidence was evenly balanced before she allowed the jury verdict to stand.

The state counters that although the trial justice had reservations regarding the jury's verdict, she found that reasonable minds could differ on those points, and, thus, she was required to deny the motion for a new trial. Furthermore, the state contends that the trial justice "did not commit clear error, overlook, or misconceive any material evidence"; therefore, her decision should not be disturbed. Finally, the state points out that there was ample evidence of anal penetration presented at trial.

"It is well-settled that a defendant arguing a motion for a new trial may do so on two bases: (1) insufficiency of the evidence and (2) weight of the evidence." *State v. McDonald*, 157 A.3d 1080, 1088 (R.I. 2017); *see State v. Clark*, 974 A.2d 558, 569 (R.I. 2009) (holding that a challenge to the sufficiency of the evidence may be brought as a motion for a new trial). Although defendant's arguments conflate the two grounds, the trial justice addressed both grounds in her

bench decision, and we will therefore address both the sufficiency of the evidence and the weight of the evidence arguments.

**1**

**Sufficiency of the Evidence**

**a**

**Standard of Review**

"[W]hen confronted with a challenge to the sufficiency of the evidence by way of a new-trial motion, * * * [t]he trial justice must examine the evidence in the light most favorable to the prosecution, without assessing the weight of the evidence or the credibility of the witnesses, and draw all reasonable inferences consistent with guilt, mindful that the jury likewise has done so." *Clark*, 974 A.2d at 570. "If, after performing this review, the trial justice finds that the evidence is such that no reasonable juror could have found that each element of the charged offense was established beyond a reasonable doubt, he or she must vacate the judgment of conviction and direct the entry of a judgment of acquittal." *Id.* at 570-71. However, if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the trial justice must deny the motion for a new trial. *Id.* at 571 (emphasis omitted) (quoting *United States v. Jones*, 418 F.3d 726, 729 (7th Cir. 2005)).

"This Court reviews the trial justice's decision *de novo*; we examine the evidence in the light most favorable to the verdict which has been returned by the jury." *Clark*, 974 A.2d at 571 (citing *United States v. Paret-Ruiz*, 567 F.3d 1, 5 (1st Cir. 2009)). "We will not overturn a guilty verdict unless, viewing the evidence in the light most favorable to the prosecution, no reasonable jury could have rendered it." *Id.* (brackets omitted) (quoting *Paret-Ruiz*, 567 F.3d at 5).

**b**

**Analysis**

"Sexual penetration" is defined in our general laws as,

> "sexual intercourse, cunnilingus, fellatio, and anal intercourse, or any other intrusion, however slight, by any part of a person's body or by any object into the genital or anal openings of another person's body, or the victim's own body upon the accused's instruction, but emission of semen is not required." Section 11-37-1(8).

We further elaborated on the meaning of "anal intercourse" specifically, in *In re B.H.*, cited *supra*. In that case, two complainants testified that the respondent made them put their penises "'inside' respondent's 'butt.'" *In re B.H.*, 138 A.3d at 778. We found this testimony insufficient to support a charge of first-degree child molestation sexual assault because such testimony made no distinction between the buttocks and the anus, penetration of the anus being required for such a charge. *Id.* at 781, 782.

Emma testified more precisely and in greater detail than the testimony we found to be insufficient in *In re B.H.* Emma specifically reported "anal pain" and described defendant's movements during the assault—pain and movements that are consistent with anal penetration. Such testimony we find to be sufficient to support a charge of first-degree child molestation sexual assault. We are of the opinion that the state presented sufficient evidence of anal penetration, and thus the trial justice properly denied defendant's motion for a new trial on sufficiency grounds.[8]

---

[8] Although defendant also argued below that there was insufficient evidence of vaginal penetration, the trial justice did not rule on that issue nor did defendant request that she do so after she rendered her bench decision. Nor does defendant raise that issue on appeal.

**2**

**Weight of the Evidence**

**a**

**Standard of Review**

"[W]hen a trial justice is presented with a motion for a new trial based on the weight of the evidence, he or she acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Johnson*, 199 A.3d 1046, 1050-51 (R.I. 2019) (quoting *State v. Gomez*, 116 A.3d 216, 223 (R.I. 2015)). "The trial justice must consider the evidence in light of the jury charge, then independently assess the credibility of the witnesses and the weight of the evidence, and also ultimately determine whether he or she would have reached a result different from that reached by the jury." *Id.* at 1051 (brackets omitted) (quoting *Gomez*, 116 A.3d at 223). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Id.* (quoting *Gomez*, 116 A.3d at 223). "Only when the trial justice does not agree with the jury's verdict, must he or she embark on a fourth analytical step." *Id.* (brackets omitted) (quoting *Gomez*, 116 A.3d at 223).

"This Court's review of a denial of a motion for a new trial [based on the weight of the evidence] is deferential because the trial justice is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Johnson*, 199 A.3d at 1051 (deletion omitted) (quoting *Gomez*, 116 A.3d at 223). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *Id.* (quoting *Gomez*, 116 A.3d at 223).

**b**

**Analysis**

After stating that she had some reservations that the state had proved its case beyond a reasonable doubt, the trial justice embarked on a thorough and meticulous review of the evidence presented at trial. She then articulated why, on each of the disagreed upon points, reasonable minds could have reached conclusions that differed from her own. Specifically, the trial justice found Emma's testimony somewhat weak because she appeared reluctant to testify and did not look at the jury, but the trial justice recognized that the jury could have found Emma's demeanor attributable to embarrassment or as "further evidence of the sexual trauma inflicted on her by [d]efendant." Although the trial justice was "left wondering why the sexual penetration happened only once, and why the sexual contact ended five or six months prior to [Emma's] disclosure[,]" this could have been attributable to the police visit to the apartment around that time frame. The trial justice likewise took issue with the inconsistencies in Velez's testimony, but found that she was otherwise a strong witness who the jury could have reasonably chosen to believe.

Although the defendant contends that no reasonable mind could have found him guilty of the charges, we disagree. After a thorough review of the record, we are of the opinion that the trial justice did not overlook or misconceive any material evidence, nor did she clearly err by denying the defendant's motion for a new trial, because she applied the appropriate standard to her review of the evidence, and after finding that reasonable minds could differ with her own conclusions, she properly denied his motion for a new trial.

## III

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court and remand the papers thereto.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Eric Mensah. |
| **Case Number** | No. 2019-75-C.A.<br>(P1/16-1489A) |
| **Date Opinion Filed** | May 14, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of Attorney General |
| | For Defendant:<br><br>George J. West, Esq. |